135 P.3d 129

**Adrian D. DOUGLASS, Plaintiff–Appellant,**

v.

**PFLUEGER HAWAII, INC. dba Pflueger Acura, Defendant–Appellee.**

No. 26363.

Supreme Court of Hawai'i.

May 25, 2006.

As Corrected May 30, 2006.

522

Timothy L. MacMaster, on the briefs, Honolulu, for plaintiff-appellant.

Barbara A. Petrus and M. Elizabeth Raxter (of Goodsill Anderson Quinn & Stifel), Honolulu, on the briefs, for defendant-appellee.

MOON, C.J., LEVINSON, NAKAYAMA, and DUFFY, JJ.; ACOBA, J., concurring separately.

**Opinion of the Court by MOON, C.J.**

This appeal concerns the sole question whether plaintiff-appellant Adrian D. Douglass, a minor at the time he was hired by defendant-appellee Pflueger Hawai'i, Inc. dba Pflueger Acura (Pflueger), is contractually bound by an arbitration provision set forth in Pflueger's Employee Handbook. Douglass appeals the December 30, 2003 order of the Circuit Court of the First Circuit, the Honorable Victoria S. Marks presiding, granting Pflueger's motion to stay action and to compel arbitration of the claims asserted by Douglass in his complaint.[1] Douglass' claims stem from his allegations of sexual harassment and assault committed by his supervisor, an employee of Pflueger.

On appeal, Douglass contends that the circuit court erred in compelling arbitration be-

---

1. "[O]rders granting stays and compelling arbitration are appealable" final orders. *Ass'n of Owners of Kukui Plaza v. Swinerton & Walberg Co.*, 68 Haw. 98, 107, 705 P.2d 28, 35 (1985); *see also Luke v. Gentry Realty, Ltd.*, 105 Hawai'i 241, 246 n. 10, 96 P.3d 261, 266 n. 10 (2004).

cause: (1) Douglass was a minor child who did not have the legal capacity to bind himself as a party to "an enforceable, valid, and irrevocable" arbitration agreement; (2) the arbitration provision contained in the Employee Handbook is not a valid and enforceable contract; and (3) Douglass produced sufficient evidence in opposition to Pflueger's motion to compel for the court to have sustained the motion and allow the case to proceed to trial. Douglass further contends that Pflueger waived its right to compel arbitration because it knowingly and voluntarily accepted the benefits of the judicial process.

For the reasons discussed *infra*, we vacate the December 30, 2003 order staying the instant action and compelling arbitration and remand this case for further proceedings consistent with this opinion.

## I. *BACKGROUND*

On or about August 31, 2001, Pflueger hired Douglass as a lot technician at the Pflueger Acura car lot in Honolulu, Hawaiʻi. At that time, Douglass was seventeen years old (less than four months shy of the age of majority, *i.e.*, eighteen years [2]), having graduated from high school in the spring of 2001. On September 13, 2001, Douglass attended an employee orientation, where he received Pflueger's Employee Handbook [hereinafter, the Employee Handbook or the Handbook]. The Employee Handbook contained, *inter alia*, policies and procedures regarding Pflueger's anti-harassment/discrimination policies and an arbitration provision. The provision located on page 20 of the Handbook provides:

### *Arbitration Agreement*

Any and all claims arising out of the employee's employment with the Company and his/her termination shall be settled by final binding arbitration in Honolulu, Hawaiʻi, in accordance with the arbitration provisions of the Federal Arbitration Act and the rules and protocol prevailing with the American Arbitration Association.

Any claim must be presented for arbitration within two (2) years of the date upon which the claimant became aware of, or should have become aware of the claim.

The results of any arbitration shall be final and binding upon the parties. The parties agree not to institute any action in any court located in the State of Hawaiʻi or elsewhere against the other arising out of the claims covered by this paragraph.

(Emphasis in original.)

At the September 13, 2001 meeting, Douglass signed an acknowledgment form, located at page 60 in the Employee Handbook, which stated in full as follows:

### ACKNOWLEDGMENT

This employee handbook describes important information about the Company and I understand that I should consult the Business Manager regarding any questions not answered in the handbook. **The provisions contained in this handbook are presented as a matter of information only and do not constitute an employment contract.** I have entered into my employment relationship with the Company voluntarily and acknowledge that there is no specified length of employment. At any time, either I or the Company can terminate the relationship at-will, with or without cause or notice, as long as there is no violation of applicable federal or state law.

I also understand that because business judgments and needs may change from time to time, the guideline described herein are not conditions of employment. The Company has the right to change this handbook at any time and without advance notice.

I have received a copy of Pflueger Group's Employee Handbook and I have read and understand the information outlined in the handbook. I have asked any questions I may have concerning its con-

---

2. Douglass was born on December 7, 1983. Hawaiʻi Revised Statutes (HRS) § 577–1 (1993) provides:

 **Age of majority.** All persons residing in the State, who have attained the age of eighteen

years, shall be regarded as of legal age and their period of minority to have ceased.
(Emphasis in original.)

tents and will comply with all policies and procedures to the best of my ability.

(Emphases in original.)

On or about November 29, 2001, Douglass was injured on the job when a coworker sprayed him on the buttocks area with an air hose. Subsequently, on May 2, 2002, Douglass filed a complaint with the Hawai'i Civil Rights Commission (HCRC). In response to his request to withdraw his HCRC complaint and pursue the matter in court, the HCRC, on September 25, 2002, issued a right-to-sue letter to Douglass, pursuant to HRS § 368–12 (1993).[3] Thereafter, on December 17, 2002, Douglass filed an action against Pflueger in the circuit court. The complaint essentially asserted that: (1) Douglass was sexually assaulted in an attack in which his supervisor at Pflueger's car lot "took an air hose, held it against and/or in close proximity to his buttocks, and unleashed a blast of compressed air"; (2) Douglass' anus, rectum and colon were instantaneously penetrated, inflated, and dilated by the force of the blast; (3) Douglass was treated at the Emergency Department of the Kapiolani Medical Center for Women and Children; and (4) he was admitted to the hospital overnight for further observation and treatment. In his complaint, Douglass alleged five employment law claims: (1) Hostile, Intimidating and/or Offensive Working Environment; (2) Unsafe Working Environment; (3) Sexual Assault and Sexual Discrimination; (4) Negligent Training (of its Supervisor); and (5) Negligent Supervision.

After filing its answer to the complaint, Pflueger's attorney, Barbara Petrus of Goodsill Anderson Quinn & Stifel, took Douglass' deposition on August 14, 2003. On September 11, 2003, the parties stipulated to the partial dismissal with prejudice of Douglass' negligent supervision and negligent training claims. On September 16, 2003, Douglass filed his Pretrial Statement. Pflueger filed

its Responsive Pretrial Statement on November 12, 2003.

Thereafter, on December 1, 2003, Pflueger filed its motion to stay this action and compel arbitration. The motion requested the circuit court to "stay this action and to compel arbitration in this dispute in accordance with the [a]rbitration [a]greement set forth in [the] Employee [H]andbook." The circuit court heard Pflueger's motion on December 29, 2003. At the conclusion of the parties' oral argument, the circuit court granted the motion, stating:

> Well, I'm going to grant the motion. I think you have a situation where, as Ms. Petrus [Pflueger's counsel] says, you have a person who accepts the benefits of some of the contractual provisions and then tries to disavow one other contractual provision, and I don't think [ ] that's appropriate. And your argument is that if it wasn't specifically discussed or if they don't have a specific memory about it that [ ] somehow would allow anybody to disavow any contract that they sign. I don't find that particularly persuasive.

On December 30, 2003, the circuit court issued its written order granting Pflueger's motion to compel arbitration. On January 27, 2004, Douglass timely filed his appeal.

## II. STANDARD OF REVIEW

A petition to compel arbitration is reviewed *de novo*. *Dines v. Pac[.] Ins. Co., Ltd.*, 78 Hawai'i 325, 326, 893 P.2d 176, 177, *reconsideration denied*, 78 Hawai'i 474, 896 P.2d 930 (1995). *See also Shimote v. Vincent*, 80 Hawai'i 96, 99, 905 P.2d 71, 74 (App.), *cert. denied*, 80 Hawai'i 187, 907 P.2d 773 (1995). The standard is the same as that which would be applicable to a motion for summary judgment, and the trial court's decision is reviewed "using the same standard employed by the trial court and based upon the same evidentiary ma-

3. HRS § 368–12 provides:
 **Notice of right to sue.** The commission [(HCRC)] may issue a notice of right to sue upon written request of the complainant. Within ninety days after receipt of a notice of right to sue, the complainant may bring a civil action under this chapter. The commission may intervene in a civil action brought pursu-

ant to this chapter if the case is of general importance.
(Emphasis in original.) Pursuant to HRS § 368–11(a) (Supp.2004), the HCRC has jurisdiction, *inter alia*, "over the subject of discriminatory practices made unlawful by ... this chapter [(HRS chapter 368)]."

terials as were before [it] in determination of the motion." *Koolau Radiology, Inc. v. Queen's Med[. Ctr.]*, 73 Haw. 433, 439–40, 834 P.2d 1294, 1298 (1992) (citation and internal quotation marks omitted); *see also Cuba v. Fernandez*, 71 Haw. 627, 631, 801 P.2d 1208, 1211 (1990); *First Hawaiian Bank v. Weeks*, 70 Haw. 392, 396, 772 P.2d 1187, 1190 (1989); *Feliciano v. Waikiki Deep Water, Inc.*, 69 Haw. 605, 607, 752 P.2d 1076, 1078 (1988).

*Brown v. KFC Nat'l Mgmt. Co.*, 82 Hawai'i 226, 231, 921 P.2d 146, 151 (1996) (brackets in original).

## III. *DISCUSSION*

■ At the outset, we note that the section of Pflueger's Employee Handbook entitled "At–Will Employment" states:

At all times during employment with Pflueger Group, employees shall retain the right to leave employment if they choose, Pflueger Group retains the right, as well, at all times to separate any employee from employment at any time, with or without notice, in accordance with all applicable laws.

Thus, Douglass—like all of Pflueger's employees—was an employee-at-will. *See Parnar v. Americana Hotels, Inc.*, 65 Haw. 370, 374, 652 P.2d 625, 627 (1982) (recognizing "at-will" employment as being "terminable at the will of either party, for any reason or no reason") (citing 9 S. Williston, Contracts § 1017 (3d ed.1967) and Annot., 51 A.L.R.2d 742 (1957)). However, "at-will" does not mean the nonexistence of an agreement of employment between the parties.

■ Although the record in the instant case does not indicate the existence of an express/written employment contract, it is undisputed that a contract of employment, *albeit* oral in nature, was formed at the time Pflueger hired Douglass. *See* HRS § 378–1 (1993) (defining employment to mean "any service performed by an individual for another person under any contract of hire, express or *implied, oral* or written, whether lawfully or unlawfully entered into") (emphases added). Nonetheless, in order for an oral contract to be enforceable, there must be an offer, an acceptance, and consideration. *See*

*Shoppe v. Gucci Am., Inc.*, 94 Hawai'i 368, 384, 14 P.3d 1049, 1065 (2000). Here, Pflueger offered Douglass the position as a lot technician, which Douglass accepted, thereby obligating (1) Pflueger to pay for the hours worked at the stated wage and (2) Douglass to perform his duties as a lot technician. *See Wilder v. Cody Country Chamber of Commerce*, 868 P.2d 211 (Wyo.1994) (concluding that "[t]he oral contract was formed when [the defendant-employer] offered employment to [the plaintiff] and he accepted. The consideration for this unilateral contract was supplied by [the plaintiff] when he performed his duties as an employee in the bargained for exchange") (citations omitted); *see also* Restatement (Second) of Contracts § 71 (1981) (consideration is supplied by bargained for performance).

As previously stated, the parties have raised issues regarding the validity and enforceability of the alleged arbitration agreement and possible waiver of such an agreement. The threshold question, however, is whether Douglass, as a minor, has an absolute right to disaffirm his employment contract with Pflueger, including the condition that "[a]ny and all claims arising out of the employee's employment with the Company and his/her termination shall be settled by final binding arbitration[.]"

### A. *The Infancy Doctrine*

■ Hawai'i has long recognized the common law rule—referred to as "the infancy doctrine" or "the infancy law doctrine"—that contracts entered into by minors are voidable. *See, e.g., Jellings v. Pioneer Mill Co.*, 30 Haw. 184 (1927); *Zen v. Koon Chan*, 27 Haw. 369 (1923); *McCandless v. Lansing*, 19 Haw. 474 (1909). Under this doctrine, a minor may, upon reaching the age of majority, choose either to ratify or avoid contractual obligations entered into during his or her minority. *See* 4 Richard A. Lord, *Williston on Contracts* § 8:14 (4th ed.1992); *see also* Restatement (Second) of Contracts, §§ 7, 12, and 14 (1979); 7 Joseph M. Perillo, *Corbin on Contracts* § 27.4 (2002 ed.). Traditionally, the reasoning behind the infancy doctrine was based on the well-established common law principles that the law should protect

children from the detrimental consequences of their youthful and improvident acts. As the California Court of Appeals explained in *Michaelis v. Schori,* 20 Cal.App.4th 133, 24 Cal.Rptr.2d 380 (1993):

The rule has traditionally been that the law shields minors from their lack of judgment and experience and under certain conditions vests in them the right to disaffirm their contracts. Although in many instances such disaffirmance may be a hardship upon those who deal with an infant, the right to avoid his contracts is conferred by law upon a minor for his protection against his own improvidence and the designs of others. *It is the policy of the law to protect a minor against himself and his indiscretions and immaturity as well as against the machinations of other people and to discourage adults from contracting with an infant. Any loss occasioned by the disaffirmance of a minor's contract might have been avoided by declining to enter into the contract.*

*Id.* at 381 (citation and internal quotation marks omitted) (emphasis added); *see also Dodson v. Shrader,* 824 S.W.2d 545, 547 (Tenn.1992) ("[T]he underlying purpose of the infancy doctrine ... is to protect minors from their lack of judgment and from squandering their wealth through improvident contracts with crafty adults who would take advantage of them in the marketplace." (Citation and internal quotation marks omitted.)).

The rule that a minor's contracts are voidable, however, is not absolute. An exception to the rule is that a minor may not avoid a contract for goods or services necessary for his health and sustenance. *See* 5 Richard A. Lord, *Williston on Contracts* § 9:18 (4th ed.1993); *see also Creech v. Melnik,* 147 N.C.App. 471, 556 S.E.2d 587, 590–91 (2001); *Garay v. Overholtzer,* 332 Md. 339, 631 A.2d 429, 443–45 (1993). Such contracts are binding, even if entered into during minority, and a minor, upon reaching majority, may not, as a matter of law, disaffirm them. *See Muller v. CES Credit Union,* 161 Ohio

App.3d 771, 832 N.E.2d 80, 85 n. 4 (2005) (stating that contracts for the purchase of necessities, which "are food, medicine, clothes, shelter or personal services usually considered reasonably essential for the preservation and enjoyment of life[,]" are valid exceptions to the general rule) (citation and internal quotation marks omitted); *see also Yale Diagnostic Radiology v. Estate of Harun Found.,* 267 Conn. 351, 838 A.2d 179, 182 (2004). As the Maryland Court of Appeals summarized in *Schmidt v. Prince George's Hospital,* 366 Md. 535, 784 A.2d 1112 (Ct. App.2001):

By the common law, persons, under the age of twenty-one years,[4] are not bound by their contracts, <u>except for necessaries</u>, nor can they do any act, to the injury of their property, which they may not avoid, when arrived at full age....

They are allowed to contract for their benefit with power in most cases, to recede from their contract when it may prove prejudicial to them, <u>but in their contract for necessaries, such as board, apparel, **medical aid**, teaching and instruction, and other necessaries, they are absolutely bound, and may be sued and charged in execution</u>; but it must appear that the things were absolutely necessary, and suitable to their circumstances, and whoever trusts them does so at his peril, or as it is said, deals with them at arms' length.

Their power, thus[,] to contract for necessaries, is for their benefit, because the procurement of these things is essential to their existence, and if they were not permitted so to bind themselves they might suffer.

*Id.* at 1116 (citation and footnote omitted) (underscored emphases in original) (bold emphasis added).

It is apparent that the Hawai'i Legislature has, through the enactment of several statutory provisions codified the principle that contracts relating to medical care, hospital care, and drug or alcohol abuse treatment are contracts for "necessaries" (*i.e.,* medical aid). These statutes explicitly provide that

---

4. In Hawai'i, the age of majority was reduced from twenty to eighteen years of age, effective March 28, 1972. 1972 Haw. Sess. L. Act 2, § 1 at 2, 28; *see also* Sen. Stand. Comm. Rep. No. 74–72, in 1972 Senate Journal, at 777.

minors who enter into contracts for the medical services described therein cannot later disaffirm them by reason of their minority status. For example, HRS § 577A–2 (1993) provides:

> The consent to the provision of medical care and services by public and private hospitals or public and private clinics, or the performance of medical care and services by a physician licensed to practice medicine, *when executed by a female minor* [which is defined in section 577A–1 (1993) as a minor who is "any person from the age of fourteen to seventeen inclusive"] *who is or professes to be pregnant, or by a minor who is or professes to be afflicted with a venereal disease, or a minor seeking family planning services shall be valid and binding* as if the minor had achieved his or her majority as the case may be; that is, ... *shall be deemed to have, and shall have the same legal capacity to act, and **the same legal obligations** with regard to the giving of such consent ..., **as a person of full legal age** and capacity, ...* and such consent **shall not be subject to later disaffirmance by reason of such minority** [.]

(Emphases added.) Further, HRS § 577A–4 (1993) provides in relevant part that:

> If a minor consents to receive medical care and services, the spouse, parent, custodian, or guardian of the minor patient shall not be liable for the legal obligations resulting from the furnishing of medical care and services provided by the public and private hospital, or public and private clinic or physician licensed to practice medicine. *A minor who consents to the provision of medical care and services under this section shall assume financial responsibility for the costs of such medical care and services.*

(Emphasis added.) HRS § 577–26 (1993), entitled "Alcohol or drug abuse relating to minors; diagnosis, counseling, and related activities," also provides in pertinent part that

> [t]he consent to the provision of furnishing counseling services for alcohol or drug abuse by the counselor when executed by a minor who is or professes to suffer from alcohol or drug abuse, **shall be valid and binding as if the minor had achieved the minor's majority;** that is, the minor who is or professes to suffer from alcohol or drug abuse, *shall be deemed to have, and shall have the same legal capacity,* the infancy of the minor and any contrary provisions of law notwithstanding, and *such consent **shall not be subject to later disaffirmance by reason of such minority** [.]*

(Emphases added.)

Inasmuch as none of the parties to this appeal contend that Douglass' employment was "a necessary," it would appear that under the well-recognized infancy doctrine, Douglass would be entitled to disaffirm his employment contract, including the purported arbitration agreement. However, a review of Hawaii's child labor law—specifically HRS § 390–2 (1993 & Supp.2005)—evinces the legislature's intent to incorporate the rationale underlying the common law infancy doctrine—that is, to protect children from the detrimental consequences of their youthful and improvident acts—into the statutory scheme and impose upon the Department of Labor and Industrial Relations (DLIR) the responsibility of promulgating rules and regulations to effectuate such intent.[5]

Under Hawaii's child labor law, "[n]o minor under eighteen years of age shall be employed or permitted to work in, about, or in connection with any gainful occupation at any time **except** as otherwise provided in this section." HRS § 390–2(a) (emphasis added). To avoid violating child labor laws, employers and minors must meet certain requirements set forth in the statute as follows:

> (b) A minor who has attained the age of *sixteen years but not eighteen years* may be employed during periods when the minor is not legally required to attend school or when the minor is excused by school authorities from attending school; provid-

---

5. HRS § 390–6 (1993), in effect at the time of Douglass' employment, provided in relevant part that "[t]he director [of the DLIR] may adopt rules and regulations for the purpose of carrying out this chapter[.]"

ed that the employer of the minor records and keeps on file the number of *a valid certificate of age issued to the minor* by the department [of labor and industrial relations (DLIR)].

(c) A minor who has attained the age of *fourteen years but not sixteen years* may be employed or permitted to work:

. . . .

(2) If the employer of the minor procures and keeps on file *a valid certificate of employment* [.]

. . . .

(d) A minor *under fourteen years* of age may be employed or permitted to work in theatrical employment or in harvesting of coffee under circumstances and conditions prescribed by the director by regulation; provided that:

. . . .

(3) The employer of the minor procures and keeps on file *a valid certificate of employment* [.[6]]

HRS § 390–2 (emphases added).

Section 390–2 was enacted in 1969, replacing Revised Laws of Hawai'i § 88–22 (1955). *See* 1969 Haw. Sess. L. Act 162, pt of § 2. In considering the proposed revision, the House Standing Committee Report indicated in relevant part that:

### 4. Modify Employment Certificate Requirements

A new concept in work permit requirements is proposed. Presently, before a minor can be put to work, his prospective employer must first get an **employment** certificate for him. The certificate is returned by the employer to the department for cancellation when the minor terminates employment. This procedure is repeated if the minor changes employer or is reemployed later by his former employer. Under the proposed revision, a 16– or 17–year–old minor would be issued an **age** certificate **without regard to occupation or employer**. This **age** certificate (wallet size) would be valid for any legal employment unless invalidated in the best interests of a minor as to specific employment.[7] An employer, upon hiring a 16– or 17–year–old minor, would be required to record and keep on file the number of the certificate of age and insure that the minor is not legally required to be in school. This modification would benefit minors and employers and appreciable savings in man hours and forms would accrue to the State.

Hse. Stand. Comm. Rep. No. 441, in 1969 House Journal, at 799 (underscored emphases added) (bold emphases in original); *see also* Sen. Stand. Comm. Rep. No. 809, in 1969 Senate Journal, at 1183.

Prior to 1969, *all* minors seeking employment were required to obtain a certificate of employment, which, as previously noted, requires the signature of a parent or guardian of the minor, as well as information from the employer as to, *inter alia*, the hours of work and the nature of the employment. The 1969 amendment eased the constraint on minors "who ha[ve] attained the age of sixteen years but not eighteen years" to obtain employment by eliminating the aforementioned re-

---

6. DLIR procedures require that the application for a certificate of employment be signed by the minor and his or her parent or guardian. The employer is also required to complete a section of the application and provide information regarding, *inter alia*, the nature of the work to be performed by the minor and the hours of work. *See* DLIR Form "CL–1 Application for Minor's Certificate of Employment," available at http://www.hawaii. gov/labor. A certificate of age may be obtained from the DLIR by presenting an acceptable proof of age document, such as a birth certificate, driver's license, immigration record, State ID, etc. No application form is required to be completed. *See* DLIR "Procedures for Obtaining a Child Labor Certificate," available at http://www.hawaii. gov/labor. *See also* Hawai'i Rules of Evidence Rule 201(b) & (c) (1993) (stating that a court may take judicial notice, whether requested or not, of facts "not subject to reasonable dispute ... that [are] ... capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned").

7. We note that the legislature explicitly authorizes the director of labor and industrial relations to "suspend, revoke or invalidate any certificate of employment or age if in the director's judgment it was improperly issued, the minor is illegally employed, or the nature or condition of employment is such as to injuriously affect the health, safety or well-being of the minor or contribute toward the minor's delinquency." HRS § 390–4 (1993).

quirements. In other words, since 1969, sixteen—and seventeen-year-olds are no longer required to secure parental consent, and the DLIR does not require any information from the employer; sixteen—and seventeen-year-olds are merely required to present his or her certificate of age to a prospective employer, which the minor obtains from the DLIR after producing an acceptable proof of age document.

The 1969 amendment, however, retained the requirement that all minors under sixteen must obtain a certificate of employment, the application for which requires parental consent and information from the employer as previously described. Consistent with its intent to protect minors against exploitation and injury, the legislature also authorized the DLIR to refuse a request for a certificate of employment if "the nature of the employment or the place thereof is such as to injuriously affect the health, safety or well-being of the minor or contribute towards the minor's delinquency." HRS § 390-3(b) (1993).

 With respect to contracts of employment, it is apparent that, by relaxing the requirements for sixteen—and seventeen-year-olds to obtain employment, the legislature clearly viewed minors in this particular age group—being only one to two years from adulthood—as capable and competent to contract for gainful employment and, therefore, should be bound by the terms of such contracts.[8] Similarly, inasmuch as the parent or guardian of a minor under sixteen is required to sign the application for a certificate of employment, which contains specific information regarding the nature and conditions of that employment, before entering into an employment contract, any such contract is equally binding on said minor. However, consistent with the policy of protecting minors until they attain the age of majority, the legislature provided an additional safeguard by authorizing the DLIR to "suspend, revoke

or invalidate" any certificate of employment or age previously issued if the minor's employment is later found to be detrimental to the minor. *See* HRS § 390-4, quoted *supra* note 7. Thus, based on the foregoing reasoning, we conclude that, inasmuch as the protections of the infancy doctrine have been incorporated into the statutory scheme of Hawaii's child labor law, the general rule that contracts entered into by minors are voidable is not applicable in the employment context.

In applying the foregoing discussion to the circumstances of the instant case, we recognize that the record does not indicate whether Douglass had, in fact, obtained an age certificate prior to his employment with Pflueger. However, even if he did not, Douglass should, nevertheless, be bound by the terms of his employment contract with Pflueger. First, there is nothing in the statutory scheme of the child labor law that renders Douglass' employment invalid or illegal based on his failure to obtain an age certificate. Second, it is undisputed that Douglass was, at the time he was hired, a seventeen-year-old high school graduate, who was only four months away from majority. And, third, there is nothing in the record to suggest that "the nature or condition of [Douglass'] employment [as a lot technician was] such as to injuriously affect [his] health, safety or well-being . . . or contribute towards [his] delinquency" so as to trigger the suspension, revocation, or invalidation authority bestowed upon the DLIR director pursuant to HRS § 390-4. In other words, whether Douglass did or did not obtain an age certificate is irrelevant; it does not change the fact that Hawaii's child labor law provides for the protections of the infancy doctrine and renders inapplicable the general rule that contracts entered into by minors are voidable in the employment context. To conclude otherwise would be inconsistent

---

8. Similarly, in the context of insurance contracts, the legislature—through its enactment of HRS § 431:10-203 (2005)—has provided that "[a] minor of the *age of fifteen or more,* as determined by the nearest birthday, shall be deemed to be competent to," *inter alia:*

(1) Contract for any form of life insurance or accident and health or sickness insurance on

the minor's own life or body, for the minor's own benefit or for the benefit of the minor's father, mother, spouse, child, brother, sister, or grandparent; [and]

(2) Surrender, make loans upon, or assign any insurance issued at any time upon the minor's life or body[.]

(Emphasis added.)

with the clear legislative policy that sixteen— and seventeen-year-old minors do not, in accordance with the common law infancy doctrine, have an absolute right to disaffirm their employment contracts.

Accordingly, we hold that the circuit court properly rejected Douglass' argument that he is entitled to disaffirm his employment contract, including the arbitration provision, by reason of his minority status. *Mossman v. Hawaiian Trust Co., Ltd.*, 45 Haw. 1, 15–16, 361 P.2d 374, 382 (1961) (agreeing with determination of the trial court, but for different reason); *see also Ko'olau Agric. Co., Ltd. v. Comm'n on Water Res. Mgmt.*, 83 Hawai'i 484, 493, 927 P.2d 1367, 1376 (1996) (same). Consequently, we now turn to Douglass' contention that the arbitration provision at issue is not a valid and enforceable agreement.

B. *The Validity and Enforceability of the Arbitration Provision*

■ "[W]hen presented with a motion to compel arbitration, the court is limited to answering two questions: 1) whether an arbitration agreement exists between the parties; and 2) if so, whether the subject matter of the dispute is arbitrable under such agreement." *Koolau Radiology, Inc.*, 73 Haw. at 445, 834 P.2d at 1300.[9] This court has stated that:

> Under the common law, agreements to arbitrate were not enforceable. *Yoshioka v. E.F. Hutton & Co.*, 2 Haw.App. 125, 126, 626 P.2d 1186, 1187 (1981) (citation omitted). Parties could agree to arbitrate an existing controversy, but either party could

freely revoke or abrogate such an agreement at any time prior to the entry of a final arbitration award. *Textile Workers Union v. Lincoln Mills of Alabama*, 353 U.S. 448, 466[, 77 S.Ct. 912, 1 L.Ed.2d 972] (1957) (Frankfurter, J., dissenting). Over the course of time, however, both federal and state law have evolved to the point where the enforceability of arbitration agreements has been expressly approved.

Hawai'i has codified its endorsement of the enforceability of arbitration agreements in HRS ch. 658 (1993). The court has previously held that "under [Hawaii's] arbitration statute, before parties to a lawsuit can be ordered to arbitrate pursuant to [HRS] § 658-3[ (1993) [10]] HRS § 658-1 requires that an enforceable, valid, and irrevocable agreement, in writing, exists." *Koolau Radiology, Inc.*, 73 Haw. at 439, 834 P.2d at 1298. In this connection HRS § 658-1 provides in relevant part that "[a] provision *in a written contract* to settle by arbitration a controversy thereafter *arising out of the contract* ... shall be valid, enforceable, and irrevocable save only upon such grounds as exist for the revocation of any contract."[ [11]] (Emphases added.)

*Brown*, 82 Hawai'i at 232, 921 P.2d at 152 (some brackets in original) (footnote omitted).

■ Moreover,

> "[t]his court has long recognized the strong public policy supporting Hawaii's arbitration statutes as codified in HRS Chapter 658. We have stated that '[t]he proclaimed public policy ... is to encour-

---

9. We note that, here, the parties do not dispute that Douglass' complaint falls within the purported arbitration agreement. It is the former inquiry that is the center of dispute in this appeal.

10. HRS § 658-3 (1993) expressly indicates that:

> The court shall hear the parties, and *upon being satisfied that the making of the agreement or the failure to comply therewith is not in issue*, the court hearing the application shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement. *If the making of the agreement or the default is in issue, the court shall proceed summarily to the trial thereof.*
> (Emphases added.)

11. In 2001, the legislature enacted new arbitration statutes codified as HRS chapter 658A (Uniform Arbitration Act), replacing HRS chapter 658 (Arbitration and Awards). 2001 Haw. Sess. L. Act 265, § 5 at 820 (repealing HRS chapter 658); 2001 Haw. Sess. L. Act 265, § 1 *et seq.* at 810–20 (enacting HRS chapter 658A). However, HRS chapter 658A is applicable to agreements to arbitrate made after July 1, 2002. Thus, even assuming at this point in the discussion that the arbitration provision at issue in this case, which is contained in the Employee Handbook, the receipt of which was acknowledged by Douglass on September 13, 2001, constituted an enforceable agreement, the new HRS chapter 658A would not be applicable.

age arbitration as a means of settling differences and thereby avoiding litigation.' " *Bateman Constr., Inc. v. Haitsuka Bros., Ltd.*, 77 Hawai'i 481, 484, 889 P.2d 58, 61 (1995).

*Lee v. Heftel*, 81 Hawai'i 1, 4, 911 P.2d 721, 724 (1996) (brackets in original). However, "[e]ven though arbitration has a favored place, there still must be an underlying agreement between the parties to arbitrate. Without an agreement to arbitrate, a court may not force parties to engage in arbitration." *Luke v. Gentry Realty, Ltd.*, 105 Hawai'i 241, 247, 96 P.3d 261, 267 (2004) (citations and internal quotation marks omitted); *see also Moss v. Am. Int'l Adjustment Co., Inc.*, 86 Hawai'i 59, 63, 947 P.2d 371, 375 (1997) ("[A]rbitration must be agreed upon by the parties and evinced by a written agreement, despite the strong policy in its favor." (Citations omitted.)).

We held in *Brown* that, in order to be valid and enforceable, an arbitration agreement must have the following three elements: (1) it must be in writing; (2) it must be unambiguous as to the intent to submit disputes or controversies to arbitration; and (3) there must be bilateral consideration. 82 Hawai'i at 238–40, 921 P.2d at 158–60. Accordingly, we now address each element as it relates to the present case.

### 1. The Existence of a Writing

The parties do not dispute that the arbitration provision in this case constitutes a writing. The provision is clearly (1) listed in the Handbook's table of contents and (2) set forth in the Employee Handbook on page 20 under the heading "Arbitration Agreement." The arbitration provision, therefore, satisfies the "writing" requirement of *Brown*.

### 2. Unambiguous Intent to Submit to Arbitration

We stated in *Earl M. Jorgensen Co. v. Mark Construction, Inc.*, 56 Haw. 466, 540 P.2d 978 (1975), that

> [t]here must be a mutual assent or a meeting of the minds on all essential elements or terms to create a binding contract. . . .

The existence of mutual assent or intent to accept is determined by an objective standard. . . . Unexpressed intentions are nugatory when the problem is to ascertain the legal relations, if any, between two parties.

*Id.* at 470–71, 540 P.2d at 982 (citations omitted).

■■■ Douglass argues that, although he signed the acknowledgment form verifying his receipt of the Handbook, he did not assent to the arbitration provision contained therein. Pflueger, however, maintains that, since Douglass signed the acknowledgment stating that he had received and understood the foregoing document, he must therefore have agreed to the terms in the Handbook, including the arbitration process for any disputes or controversies arising out of his employment and/or termination. In support of its contention, Pflueger relies solely upon this court's decision in *Brown*.

In *Brown*, a terminated employee of African American descent (the plaintiff) brought suit against his former employer, KFC National Management Company (KFC), alleging, *inter alia*, race discrimination and harassment. 82 Hawai'i at 230, 921 P.2d at 150. KFC sought to enforce the arbitration clause contained in the employment application. *Id.* at 231, 921 P.2d at 151. The clause provided:

> Because of the delay and expense which results from the use of the federal and state court systems, *KFC and I agree to submit to binding arbitration any controversies concerning my compensation, employment[,] or termination of employment, rather than to use such court systems.* In any such arbitration, the American Arbitration Association rules shall govern the procedure[,] and the Federal Arbitration Act shall govern the substance of such controversies.

*Id.* at 230, 921 P.2d at 150 (some brackets in original) (emphasis added). We noted in *Brown* that the arbitration clause was manifestly unambiguous in its expressed intent that "KFC and [the plaintiff] agree to submit to binding arbitration[.]" *Id.* at 239, 921 P.2d at 159. We held that, "on its face, the 'written agreement for arbitration[ ]' reflects . . .

mutual assent to the arbitration of employment-related disputes[.]" *Id.* at 240, 921 P.2d at 160 (citation omitted).

Similarly, here, by its plain language, the arbitration provision is manifestly unambiguous in its expressed intent that:

> *Any and all claims arising out of the employee's employment with the Company and his/her termination **shall be settled** by final and binding arbitration ....*

> The results of any arbitration shall be **final and binding upon the parties.** *The **parties agree** not to institute any action in any court located in the State of Hawai'i or elsewhere against the other arising out of the claims covered by this paragraph.*

(Emphases added.) Indeed, the provision uses contractual terms such as "shall be settled," "final and binding upon the parties," and "[t]he parties agree." We believe that the language used in the above arbitration provision "*on its face* ... reflects ... mutual assent to the arbitration of employment-related disputes[.]" *Id.* at 240, 921 P.2d at 160 (emphasis added) (citation omitted). Nonetheless, we cannot conclude that, in combination with the surrounding circumstances presented in this case, there is mutual assent between Pflueger and Douglass to arbitrate their disputes.

Douglass argues that he could not have known about the purported arbitration agreement to consent to it when: (1) the provision "consist[s] of two paragraphs of text buried, and hidden from sight, on page 20 of the 60 page '[E]mployee [H]andbook'," and was not signed or initialed by him; (2) the signed acknowledgment form, which does not mention the purported arbitration agreement, is located forty pages away; and (3) immediately preceding the acknowledgment form is a section, entitled "DISCLAIMER," that provides in capitalized letters:

THE POLICIES DESCRIBED IN THIS HANDBOOK ARE INTENDED AS GUIDELINES REFLECTING CURRENT POLICIES AND ARE NOT INTENDED TO AND DO NOT CREATE A CONTRACT BETWEEN YOU AND THE COMPANY[;]

and (4) the acknowledgment section itself states in bold lettering that:

> **The provisions contained in this handbook are presented as a matter of information only and do not constitute an employment contract.**

In *Kummetz v. Tech Mold, Inc.*, 152 F.3d 1153 (9th Cir.1998), the facts of which are nearly identical to the case at bar, the United States Court of Appeals for the Ninth Circuit held that, because the acknowledgment form did not contain the arbitration provision or notify the employee of the arbitration clause in the employer's information booklet, the employee did not knowingly agree to arbitrate his claims. In *Kummetz*, the plaintiff sued his former employer for employment discrimination in violation of the Americans with Disabilities Act (ADA) and the Arizona Civil Rights Act. *Id.* at 1154. About a week after he began work, the employer issued to the plaintiff an Employment Information Booklet (Booklet) and an acknowledgment form. *Id.* The acknowledgment, which the plaintiff signed, declared that:

> I understand and agree that I am covered by and must abide by the contents of this Booklet. *I also understand and agree that this Booklet in no way constitutes an employment contract* and that I remain an at-will employee.

> ....

> I understand that the policies, practices and benefits set forth in this Booklet are subject to change at any time and without prior notice at the sole and unlimited discretion of the Company. The Company also reserves the right to interpret any ambiguity or any confusion about the meaning of any term in this Booklet, and that interpretation shall be final and binding.

*Id.* (emphasis added) (ellipsis in original). The acknowledgment did not refer to or imply that the Booklet contained an arbitration provision. Consequently, the Ninth Circuit court "concluded that the employee had not knowingly agreed to the arbitration clause because '[n]othing in that acknowledgement [sic] notified [the employee] either that the [Booklet] contained an arbitration clause or that his acceptance of the [Booklet] constitut-

ed a waiver of his right to a judicial forum in which to resolve claims covered by the ADA.' " *Id.* at 1155 (some brackets in original and some added) (quoting *Nelson v. Cyprus Bagdad Copper Corp.,* 119 F.3d 756, 758–61 (9th Cir.1997) (similarly holding that there was no meeting of the minds where the employee signed an acknowledgment, which declared that he had received the handbook and agreed "to read it and understand its contents," but made no mention of the arbitration agreement contained in the handbook)).

Here, Douglass merely acknowledged his receipt and understanding of the items presented to him. He never expressed assent to the terms contained in those items, except for those terms expressly stating that the policies in the Handbook did "not create a contract," were to be treated as "guidelines," and were presented for "information only." The acknowledgment which Douglass signed makes no mention of the arbitration provision contained in the Handbook, nor sufficiently informs him that the Handbook contains terms to which he is contractually obligating himself. Nothing in the acknowledgment form that Douglass signed suggests to us that he was entering into an arbitration agreement. *Cf. Patterson v. Tenet Healthcare, Inc.,* 113 F.3d 832, 834–35 (8th Cir.1997) (holding that the arbitration clause in an employee handbook was enforceable because the acknowledgment form explicitly referenced an arbitration agreement); *Towles v. United HealthCare Corp.,* 338 S.C. 29, 524 S.E.2d 839, 842 (App.1999) (employee signed a handbook which read that "the provisions in this Handbook are guidelines and, *except for the provisions of the Employment Arbitration Policy,* do not establish a contract" (emphasis added)); *MicroStrategy, Inc. v. Lauricia,* 268 F.3d 244, 248 (4th Cir.2001) (employee signed an "Employee Acknowledgment Form **and** *Agreement to Arbitrate*" (emphases added)). Similarly, in holding that the arbitration agreement in *Brown* was valid and enforceable inasmuch as it was "severable and distinct from the remainder of the employment application," 82 Hawai'i at 246, 921 P.2d at 166, and despite the existence of a contract disclaimer, we emphasized that

the arbitration agreement is contained in a discrete section of the [employment] application, denominated "Agreement." The Agreement is boxed off from the other sections of the application. Moreover, the Employee Rights subsection, in which the arbitration agreement is located, is set off from the preceding paragraphs of the Agreement by its own subheading, labeled "Arbitration of Employee Rights." The signature line prepared for the applicant appears just below the arbitration agreement.

*Id.* at 245, 921 P.2d at 165. In addition, the plaintiff signed on the above-described signature line below the arbitration agreement. *Id.* at 229, 921 P.2d at 149.

In contrast, the arbitration provision at issue here is *not* "boxed off" or otherwise set apart from the other provisions in the Handbook or on the acknowledgment form. In fact, the arbitration provision, like all the other provisions in the Employee Handbook, is (1) introduced by its own bold faced heading and (2) in the same font size as the rest of the Handbook. Moreover, the agreement, unlike the agreement in *Brown* that was set off and on the same page as the signature line, is located on page 20 of the sixty-page Handbook, and Douglass' signature is not found until forty pages later on the acknowledgment page, which, as previously pointed out, makes no mention of the arbitration provision.

"Only if [Pflueger] had specifically called [Douglass'] attention to the arbitration clause in the [Handbook] would the clause suffice in the face of the uninformative Acknowledgement [sic]." *Kummetz,* 152 F.3d at 1156. The record before us, however, does not indicate that Douglass was informed of the existence of the arbitration provision, let alone that he would be bound by it.

■■■ The record shows that Arlene Cheung, the Human Resources Administrator for Pfleuger, "conducted [Douglass'] orientation and reviewed the provisions of Pflueger's Employee Handbook with him[;]" however, her declaration does not reveal whether she specifically mentioned the arbitration provision to Douglass. (Cheung

Decl.) The declaration made by Douglass states in relevant part that:

10. During the September 13, 2001 meeting, [Cheung] showed me some parts of the handbook after I signed the Acknowledgement [sic].

11. I do not remember exactly what parts of the employee handbook were reviewed and what was not reviewed.

12. *I do not remember discussing anything about "arbitration", or giving up the right to file a lawsuit in court, or anything else like that.*

13. It is[,] therefore, not likely that [Cheung] and I discussed anything about "arbitration" or giving up the right to file a lawsuit in court, or anything else like that.

14. I do not remember reading any part of the employee handbook entitled "Arbitration Agreement."

(Emphasis added.) Further, during his deposition, Douglass testified regarding the orientation conducted by Cheung as follows:

Q. [By defense counsel] Mr. Douglass, is this the handbook that was given to you on September 13th—

A. [Douglass] Yes.

Q. -the orientation? Is that correct?

A. Yes.

. . . .

Q. What other policies in the handbook were reviewed with you by [Cheung] at your orientation?

A. I can't remember.

Q. You can't remember?

A. I think she showed me the whole handbook, though.

. . . .

Q. Once she reviewed with you the handbook and had you sign the acknowledgment. . . . [Cheung] then gave you

the handbook to take with you, is that correct?

A. Yes.

His testimony that Cheung "showed [him] the whole handbook" does not indicate to us that he was put on notice regarding the existence of the arbitration provision and the binding effect thereof.[12] We, therefore, conclude that the second *Brown* requirement, *i.e.*, unambiguous intent to submit to arbitration, has not been satisfied. *See Malani v. Clapp*, 56 Haw. 507, 510, 542 P.2d 1265, 1267 (1975) ("It is an elementary rule of contract law that there must be . . . a meeting of the minds on all essential elements or terms in order to create a binding contract." (Citations omitted.)). Accordingly, we hold that, under the circumstances of this case, Douglass cannot be compelled to arbitrate his claims against Pflueger.

### 3. Bilateral Consideration

▮▮▮▮▮ Moreover, even assuming *arguendo* that there was mutual assent between Douglass and Pflueger to submit to binding arbitration, the alleged arbitration agreement would nonetheless fail for lack of consideration.

It is well-settled that consideration is an essential element of, and is necessary to the enforceability or validity of, a contract. Consideration is defined as a bargained for exchange whereby the promisor receives some benefit or the promisee suffers a detriment. *Gibson v. Neighborhood Health Clinics, Inc.*, 121 F.3d 1126, 1130 (7th Cir.1997) (citations omitted).

*Shanghai Inv. Co., Inc. v. Alteka Co.*, 92 Hawai'i 482, 496, 993 P.2d 516, 530 (2000), *overruled on other grounds by Blair v. Ing*, 96 Hawai'i 327, 31 P.3d 184 (2001).

The arbitration provision expressly provides that both "parties agree not to institute

12. We do not suggest, however, that one who is aware *that he or she is entering into a contract* may avoid its effect by failing to read it. Such a rule would undermine reliance on written instruments. Indeed, we have stated that "[t]he general rule of contract law is that one who assents to a contract is bound by it and *cannot complain that he has not read it or did not know what it contained.*" *Leong v. Kaiser Found. Hosp.*, 71 Haw. 240, 245–46, 788 P.2d 164, 168 (1990) (citations omitted) (emphasis added). In *Leong*, the plaintiffs did not dispute the existence of a contract, which contained an arbitration provision. Rather, they argued that "they should not be bound by the agreement to arbitrate because they had no knowledge of this provision in the contract." *Id.* at 245, 788 P.2d at 168. Here, however, the arbitration "agreement" does not meet the traditional requirements necessary to the formation of a contract.

any action in any court ... against the other[.]" On its face, the provision is supported by bilateral consideration, that is, that *both* Douglass and Pflueger would forego their respective rights to a judicial forum and accept the binding arbitration process. *See also Brown,* 82 Hawai'i at 239–40, 921 P.2d at 159–60 (concluding that "the agreement is supported by bilateral consideration that [plaintiff] and KFC would forego their respective rights to a judicial forum" based upon the "manifestly unambiguous" recitation that "KFC and [plaintiff] agree to submit to binding arbitration any controversies concerning [plaintiff's] compensation, employment[,] or termination of employment").

We note, however, that the second paragraph on the acknowledgment form contains the following reservation: "The Company has the right to change this handbook at any time and without advance notice." Although we have yet to explicitly address the effect such a reservation of rights has upon an arbitration provision within an employee handbook or booklet, the issue had been examined by the United States District Court for the Northern District of Ohio in *Trumbull v. Century Marketing Corp.,* 12 F.Supp.2d 683 (N.D.Ohio 1998). In that case, the employer distributed an employee handbook containing an arbitration clause and the following:

> [T]he company may modify, augment, delete, or revoke any and all policies, procedures, practices, and statements contained in this Handbook at any time, without notice.

*Id.* at 686 (internal quotation marks omitted). The court determined that:

> To give effect to this language and hold that a valid contract exists would be to create a contract where only one party is bound. The plaintiff would be bound by all the terms of the handbook while the defendant could simply revoke any term (including the arbitration clause) whenever it desired. Without mutuality of obligation, a contract cannot be enforced.

*Id.* at 686 (citation omitted); *see also Gourley v. Yellow Transp., LLC,* 178 F.Supp.2d 1196 (D.Colo.2001) (arbitration agreement that bound the employee but left the employer free to renege or to unilaterally modify the terms at any time was illusory). Thus, although the arbitration provision in this case, on its face, is supported by bilateral consideration, we conclude that the reservation of rights language contained in the acknowledgment form renders the purported arbitration agreement illusory. Consequently, without "mutuality of obligation," *Trumbull,* 12 F.Supp.2d at 686, the third *Brown* requirement is also not met.

Moreover, we are mindful of the fact that, in *Brown,* a similar statement existed in the employment application, specifically that "[a]ll such materials are presented for informational purposes only and *can be changed at any time by KFC, with or without notice.*" 82 Hawai'i at 229, 921 P.2d at 149 (emphasis added). Nonetheless, inasmuch as the *Brown* court severed the arbitration provision from the application and found it enforceable standing on its own, *Brown* is consistent with our holding today.

In fact, *Brown* is remarkably similar to the holding in *Patterson,* wherein the United States Court of Appeals for the Eighth Circuit

> conclude[d] ... that the arbitration clause is separate from the other provisions of the handbook and that it constitutes an enforceable contract.... First, the arbitration clause is separate and distinct. It is set forth on a separate page of the handbook and introduced by the heading, "**IMPORTANT! Acknowledgment Form.**" This page is removed from the handbook after the employee signed it and is stored in a file.... Although the preceding paragraph discusses the company's reservation of its "right to amend, supplement, or rescind" any handbook provisions, the arbitration clause uses contractual terms such as "I understand," "I agree," I "agree to abide by and accept," "condition of employment," "final decision," and "ultimate resolution." We believe that the difference in language used in the handbook and that employed in the arbitration clause would sufficiently impart to an employee that the arbitration clause stands alone, separate and distinct from the rest of the handbook. The reservation of rights language refers

to the handbook provisions relating to employment, not to the separate provisions of the arbitration agreement.

113 F.3d at 835 (citations omitted) (bold emphasis in original) (underscored emphases added).

## C. *Douglass' Remaining Contentions*

As previously stated, Douglass maintains that: (1) the evidence that he adduced in opposition to Pflueger's motion to compel arbitration was sufficient to show that genuine issues of material fact existed; [13] and (2) Pflueger waived its right to arbitrate because it had knowledge of its existing right yet induced Douglass to believe that it had no objection to the forum in which the dispute was being litigated. In light of our holding that the arbitration provision at issue is not a valid and enforceable agreement, we need not address Douglass' remaining contentions.

## IV. *CONCLUSION*

Based on the foregoing, we hold that, under the circumstances of this case, Douglass cannot be compelled to arbitrate his claims against Pflueger. We, therefore, vacate the First Circuit Court's December 30, 2003 order granting Pflueger's motion to stay action and to compel arbitration and remand this case for further proceedings.

Concurring Opinion by ACOBA, J.

I respectfully concur in the result. First, in my view this case is resolvable on the right of Plaintiff–Appellant Adrian D. Douglass (Appellant) to void the contract, and, second, assuming *arguendo* the contract is not voidable, the conditional language of the employee handbook issued by the employer renders the arbitration clause ambiguous and, thus, directory and not mandatory. In either event, I would not hinge the outcome of this case on an application of *Brown v. KFC Nat'l Mgmt. Co.*, 82 Hawai'i 226, 231, 921 P.2d 146,

151 (1996), as the majority does, but would limit *Brown's* application.

### I.

As to the first point, Appellant argues that he "was a minor who lacked the legal capacity necessary to make an agreement that could obligate him to arbitrate any of his claims." [OB at 20] I believe he is correct. As a general rule, a contract made by an infant or minor is voidable at the will of the minor, unless the contract is for "necessaries." *See Garay v. Overholtzer*, 332 Md. 339, 631 A.2d 429, 443 (1993) (explaining that "[g]enerally, the law regards contractual obligations of minors as voidable, giving the minor child the choice whether to avoid the contract, or to perform it" and that "[i]t is well established ... that a minor is liable for the value of necessaries furnished to him or her" (internal citations omitted)); *Gardner v. Flowers*, 529 S.W.2d 708, 709–10 (Tenn.1975) (stating that "[i]n general, an infant can avoid his contracts" and that "[a]n exception is made if the contract is for 'necessaries' " (internal citations omitted)); *Christian v. Waialua Agric. Co.*, 33 Haw. 34, 81 (1934) (Banks, J. dissenting) (noting that "[i]t is also well settled that, while an insane person or a minor is bound by his contract for necessaries furnished him, the extent of his obligation thereunder is to pay the reasonable value of such necessaries, irrespective of the price which he has agreed to pay"); *Field v. Hughes*, 131 Cal.App. 144, 20 P.2d 990, 991 (1933) (stating that "[t]he contract of a minor, except for necessaries furnished to him or his family, or for an obligation incurred by direct authority of statute, may be disaffirmed by him").

Some jurisdictions have provided a specific definition of the term "necessaries" to include what is thought of essentially, as the need for human survival. *See Zelnick v. Adams*, 263 Va. 601, 561 S.E.2d 711, 715–16 (2002) (opining that "[t]hings supplied which fall into the class of necessaries, include

---

**13.** This court has held that:

If the existence of an arbitration agreement is in issue, "the court shall proceed summarily to the [judge or jury] trial thereof." HRS § 658–3 [*see supra* note 10]. The trial court can only decide, as a matter of law, whether to compel

the parties to arbitrate their disputes *if there is no genuine issue of material fact regarding the existence of a valid agreement to arbitrate." Koolau Radiology, Inc.*, 73 Haw. at 439, 834 P.2d at 1295 (citation omitted) (brackets in original) (emphasis added).

board, clothing, and education" and that "Williston describes necessaries as things generally under the broad headings of food, clothing of a reasonable kind ... and shelter" (quoting 5 *Williston on Contracts* § 9:18 at 149 (Richard A. Lord, 4th ed.1993))); *Parkwood OB/GYN, Inc. v. Hess,* 70 Ohio Misc.2d 32, 650 N.E.2d 533, 534 (1995) (stating that " '[n]ecessaries' are defined as food, medicine, clothing, shelter or personal services usually considered reasonably essential for the preservation and enjoyment of life").[1]

Other jurisdictions, however, have provided for a more flexible definition of "necessaries," that takes into account the circumstances of the particular case. *See Webster St. P'ship, Ltd. v. Sheridan,* 220 Neb. 9, 368 N.W.2d 439, 442 (1985) (noting that "[j]ust what are necessaries ... has no exact definition[;] [t]he term is flexible and varies according to the facts of each individual case" and that "the question is a mixed one of law and fact, to be determined in each case from the particular facts and circumstances in such case"); *Gardner,* 529 S.W.2d at 709–10 (positing "[b]ut, what do courts mean by 'necessaries?'[; i]t is likely impossible to frame a definition to cover all cases; flexibility is both desirable and necessary" and that "the overriding requirement is that the infant must be in actual need of the goods or services in question" and opining that "[w]hether such actual need exists depends upon (1) the nature of the goods or services, (2) the need of the infant for such goods or services at the time and (3) whether the infant has sources, other than his own credit, for supplying the needed goods or services").

The parties agree that the age of majority in Hawai'i is eighteen years of age pursuant to Hawai'i Revised Statutes (HRS) § 577–1 (1993).[2] [OB at 21 and AB at 8] The parties also do not dispute that Appellant was not yet eighteen years of age at the time he received the employee handbook. [OB at 23 and AB at 11] Accordingly, under the well-established law discussed *supra,* any contract made by Appellant would be voidable at his option, unless it was for a "necessary." Defendant–Appellee Pflueger Hawai'i, Inc. dba Pflueger Acura (Appellee) does not argue that Appellant's employment was a necessary and the record as well fails to show that it was.

## II.

Appellee however argues that "[t]he public policies in favor of arbitration and against age discrimination support the enforcement of arbitration agreements against minors who accept the benefits of employment[,]" [AB at 8] and cites to *Sheller v. Frank's Nursery & Crafts, Inc.,* 957 F.Supp. 150 (N.D.Ill.1997) and *Morrow v. Norwegian Cruise Line, Ltd.,* 262 F.Supp.2d 474 (M.D.Pa.2002), for support. First, public policy considerations should not apply inasmuch as Appellee presumably was well aware of Appellant's status as a minor and the law regarding the capacity of minors to contract is well established. *See* discussion *supra.* Second, both cases cited by Appellee are distinguishable and unpersuasive.

### A.

#### 1.

*Sheller* involved the application of 9 U.S.C. § 1, the Federal Arbitration Act (the FAA), to the arbitration clause in issue. *Sheller,* 957 F.Supp. at 152. The FAA has been interpreted as evidencing a strong federal public policy in favor of arbitration. *Stout v. J.D. Byrider,* 228 F.3d 709, 714 (6th Cir. 2000). Under the FAA, any ambiguities or

---

**1.** Some courts have narrowed the definition of "necessaries" to exclude products or services that another person, such as a parent or guardian, is obligated to provide for the minor. *See Bensinger's Coex'rs v. West,* 255 S.W.2d 27, 29 (Ky.1953) (positing that "[t]o be bound upon a contract for necessaries, an infant must be in actual need of them and obliged to procure them for himself" and that "[t]hey are not necessaries to the infant if he has a parent or guardian who is willing and able to supply them"); *Lawrence v. Baxter,* 275 Mich. 587, 267 N.W. 742, 743 (1936) (concluding that a minor's contract to purchase a house and lot was not a contract for a necessary because the minor's father was obligated to provide a home for the minor).

**2.** Hawai'i Revised Statutes (HRS) § 577–1 states that "[a]ll persons residing in the State, who have attained the age of eighteen years, shall be regarded as of legal age and their period of minority to have ceased."

doubts regarding arbitration are to be resolved in favor of arbitration. *Sheller*, 957 F.Supp. at 152. In *Sheller*, the district court stated that the FAA "was applicable to the arbitration agreement at issue" in that case, as the plaintiffs did not fit into the narrow exception for seamen, railroad employees, and workers engaged in foreign or interstate commerce found in the FAA. 957 F.Supp. at 152.

First, *Sheller* is incorrect insofar as it states that "whether the Plaintiffs were minors was irrelevant to their signing of the employment application agreeing to arbitrate all claims against the company. *Indeed, Defendant required all of its employees, including adults, to sign the same agreement.*" 957 F.Supp. at 152 (emphasis added). Under this view, an employment contract required to be signed by both minors and adults would not be voidable by minors, simply because adults were bound by the same contract. The fact that adults were required to sign the same agreement is wholly irrelevant. If the fact that an adult would be held liable prevents application of the doctrine to a minor who signs the same contract, then the infancy doctrine would be nullified. Accordingly, that an employer could hold an adult liable is entirely inapposite to the proposition that a contract is voidable at the minor's behest.

Second, although construing Illinois law, the *Sheller* court recognized that there was no Illinois case law. on point. *Sheller*, 957 F.Supp. at 153. Unlike *Sheller*, other courts have held that a minor is not bound by an arbitration clause. *See H & S Homes, L.L.C. v. McDonald*, 823 So.2d 627, 630 (Ala.2001) (holding that "infancy is a valid defense to the enforcement of a properly supported motion to compel arbitration of disputes arising out of a contract"); *Wilkie v. Hoke*, 609 F.Supp. 241, 243 (W.D.N.C.1985) (denying

defendant's motion to compel arbitration because the minor plaintiff was not bound by the arbitration provision); *Dickson v. Hoffman*, 305 F.Supp. 1040, 1042 (D.C.Kan.1969) (recognizing that the public policy of Kansas protects a minor's right to disaffirm an arbitration provision in a contract); *cf. Millsaps v. Estes*, 137 N.C. 535, 50 S.E. 227, 228 (1905) (holding that an agreement by an attorney on behalf of a minor to submit to arbitration is voidable by the minor).

Third, *Sheller* also concludes that a minor should not be allowed to disaffirm a contract and simultaneously keep the "advantage of the contract—employment." 957 F.Supp. at 154. But Appellant is not seeking any benefits under a contract. Rather, he seeks redress for his injuries arising from alleged sexual harassment from his co-workers. Nor is Appellant suing under the contract. His claims relate to sexual harassment in the workplace, resulting injuries, and negligent supervision pursuant to discrimination statutes.[3] In this regard, Appellant filed a complaint with the Hawai'i Civil Rights Commission (HCRC) and was issued a right to sue letter under HRS § 368–12 (1993), entitled "Notice of right to sue."[4] It would be illogical to imply from the mere fact of his employment that Appellant, a minor, should be precluded from suing for injuries suffered at his job. Indeed, public policy as embodied in HRS § 368–12 sanctions Appellant's right to sue in court.

2.

I note that similar disagreements with *Sheller* have been espoused by another federal district court in *Stroupes v. The Finish Line, Inc.*, 2005 WL 1363573 (E.D.Tenn. 2005). Although *Stroupes* is an unpublished opinion, it is germane to the issues in the

---

3. In his complaint, Appellant alleged the following counts: I—Hostile, Intimidating And/Or Offensive Working Environment, II—Unsafe Working Environment, III—Sexual Assault and Sexual Harassment, IV—Negligent Training, V—Negligent Supervision of Mr. Ramos and Other Personnel, and VI—Punitive Damages.

4. HRS § 368–12 states:

The commission may issue a notice of right to sue upon written request of the complainant. Within ninety days after receipt of a notice of right to sue, the complainant may bring a civil action under this chapter. The commission may intervene in a civil action brought pursuant to this chapter if the case is of general importance.

instant case and, therefore, merits discussion.[5] In *Stroupes*, the minor employee and her parents brought an action against the minor's employer and one of its managers (the defendants) for sexual harassment under Title VII of the Civil Rights Act of 1964, as well as state law claims for assault and battery and outrageous conduct. The defendants moved to dismiss the claims and to compel arbitration under the Federal Arbitration Act. The district court held that the employment contracts, including arbitration agreements, were voidable due to the minor

plaintiff's age, and were voided by the filing of the action.

Similar to the discussion *supra*, in rejecting *Sheller*, the district court stated that (1) the plaintiff in that case was "not using her minority as a sword to injure the [d]efendants" and that "the only issue affected by [the plaintiff's] use of the infancy doctrine is the appropriate forum to adjudicate her claims," (2) *Sheller's* reasoning that a plaintiff's status as "[a] minor[was] irrelevant to [the minor's] signing of the employment application agreeing to arbitrate all claims

**5.** Because *Stroupes* is an unpublished opinion and the majority does not address it, I must note the following considerations in citing to it. First, helpful pieces of judicial scholarship and research, even though unpublished, are freely available through internet search engines and other public repositories. Second, although Hawai'i Rules of Appellate Procedure (HRAP) Rule 35(c) seemingly precludes citation to unpublished opinions, it neither directly applies nor expressly proscribes citations to unpublished dispositions from *other* jurisdictions. *See* HRAP Rule 35(c) (stating that "[a] memorandum opinion or unpublished dispositional order shall not be cited in any other action or proceeding except when the opinion or unpublished dispositional order establishes the law of the pending case, res judicata or collateral estoppel, or in a criminal action or proceeding involving the same respondent"). The preclusive effect of HRAP Rule 35(c) has been criticized. *See Report of AJS Special Committee on Unpublished Judicial Opinions* at 4 (recognizing the "problem perceived by the legal community with the continued use of summary disposition orders and, particularly, the inability to cite memorandum opinions despite the fact that those opinions appear to be of substantial length and content and often cite other case law as precedent for the conclusions").

Third, several courts have sanctioned the citation of unpublished dispositions of other jurisdictions under similar circumstances. *See McCoy v. State*, 80 P.3d 751, 752 (Alaska Ct.App.2002) (citing *Byrd v. Bentley*, 850 So.2d 232, 235 (Ala. 2002) (discussing unpublished federal district courts relied on by defendant)); *Waskel v. Guar. Nat'l Corp.*, 23 P.3d 1214, 1220 (Colo.App.2000) (citing an unpublished federal circuit court decision for its persuasive value); *Staff of Idaho Real Estate Comm'n v. Nordling*, 135 Idaho 630, 22 P.3d 105, 109 (2001) (approving of citation by defendant of unpublished opinion from another jurisdiction when used "as an example); *State v. Gibbs*, 769 N.E.2d 594, 598 n. 4 (Ind.App.2002) (concluding that case from another stated cited by defendant was not persuasive); *Campbell v. Markel American Insurance Co.*, 822 So.2d 617, 625 n. 4 (La.App.2001) (noting that defendant's citation to two unpublished opinions from other

jurisdictions supported defendant's position); *Palacios v. Louisiana and Delta R.R., Inc.*, 775 So.2d 698, 702 (La.App.2000) (unpublished opinion from other jurisdiction cited as persuasive); *State ex rel. Gendrich v. Litscher*, 246 Wis.2d 814, 632 N.W.2d 878, 882 n. 6 (2001) (citation to unpublished federal circuit court appropriate for its persuasive value); *State v. Allen*, 208 W.Va. 144, 539 S.E.2d 87, 103 (1999) (concluding that unpublished opinion cited from another jurisdiction was not persuasive).

Fourth, the clamor over the use of unpublished dispositions within the federal courts led the Advisory Committee on the Federal Rules of Appellate Procedure (Advisory Committee) to propose a new Rule 32.1 to the Federal Rules of Appellate Procedure (FRAP) to replace a rule similar to HRAP Rule 32(c). Memorandum from the Advisory Committee on Appellate Rules, to Judge David F. Levi, Standing Committee on Rules of Practice and Procedure (May 6, 2005, Rev. October 7, 2005) [hereinafter, Advisory Committee Memorandum]. The proposed rule requires the federal courts to permit citation to "federal judicial opinions, orders, judgments, or other written dispositions that have been ... designated as 'unpublished,' 'non-precedential,' 'not precedent,' or the like[.]" *Advisory Committee Memorandum*. Recently, United States Supreme Court Chief Justice John Roberts notified Congress that the Court would be adopting the proposed amendments effective January 1, 2007. Letter from Chief Justice John Roberts, Supreme Court of the United States, to the Speaker of the House of Representatives and the President of the Senate (April 12, 2006). The amendments take effect unless the Congress acts to the contrary.

Finally, I believe a narrow view of unpublished work would mute the development of our jurisprudence, particularly in cases of first impression as is this case here. For "[i]t is in the order of case law development that discourse on issues not covered in any existing published opinion should be disseminated and made available for examination, consideration, and citation by those similarly affected or interested." *Torres v. Torres*, 100 Hawai'i 397, 435, 60 P.3d 798, 836 (2002) (Acoba, J., dissenting).

against the company" because the defendant in *Sheller* "required all of its employees, including adults, to sign the same agreement" would eviscerate the infancy doctrine, and (3) "[a] minor suing an employer for sexual harassment is not suing on the contract." 2005 WL 1363573.

### B.

*Morrow*, the second case cited by Appellee, did not involve an employment relationship as in the instant case. That case concerned a minor child who was injured while a passenger on a cruise ship. At issue was the forum selection clause printed on the cruise ship ticket. *Morrow* relied on three cases, all of which involved forum selection clauses, rather than arbitration clauses. *See Igneri v. Carnival Corp.*, 1996 WL 68536, *3 (E.D.N.Y.2002) (granting defendant's motion to transfer plaintiff's case from the United States District Court for the Eastern District of New York to the United States District Court for the Southern District of Florida), *Harden v. Am. Airlines*, 178 F.R.D. 583, 585–86 (M.D.Ala.1998) (granting Defendant American Hawaii Cruises's motion to dismiss on the ground of improper venue based on a forum selection clause which required that any lawsuit arising out of the cruise "must be brought and *litigated,* if at all, before a court located in the State of Hawaii, to the exclusion of the courts of any other country or located in any other state of the United States" (emphasis added)); *Paster v. Putney Student Travel, Inc.*, 1999 WL 1074120, *4 (C.D.Cal.1999) (concluding that exclusive jurisdiction for the plaintiff's action against the defendant was in the courts of Vermont, rather than the United States District Court for the Central District of California). In those cases, the plaintiffs were arguing about *where* they could sue, unlike the instant case in which the question is the right to sue.

### III.

To justify its position, the majority broadly concludes that (1) the legislature, in enacting amendments to HRS chapter 390, "clearly viewed minors [between sixteen and seventeen years of age] . . . as capable and competent to contract for gainful employment and,

therefore, should be bound by the terms of such contracts[,]" majority opinion at 529, 135 P.3d at 138, or that (2) "inasmuch as the protections of the infancy doctrine have been incorporated into the statutory scheme of Hawaii's child labor law, the general rule that contracts entered into by minors are voidable is not applicable in the employment context[,]" *id.* at 529, 135 P.3d at 138. In doing so, the majority raises statutory arguments not cited to or argued by any of the parties in this case. By proceeding in this way, the majority reaches beyond the facts here and consequently calls into question the entire framework of laws pertaining to the rights of minors.

Reviewing the plain language of HRS § 390–2, and legislative history of HRS chapter 390, no legislative intent exists to support the majority. First, HRS § 390–2(a), entitled "Employment of minors under eighteen years of age," provides that "[n]o minor under eighteen years of age shall be employed or permitted to work in, about, or in connection with any gainful occupation at any time except as otherwise provided in this section." That statute, however, permits a minor between the age of sixteen and eighteen to be employed upon compliance with the requirements for a valid certificate of age issued by the Department of Labor and Industrial Relations (DLIR). *Id.* HRS § 390–2(b) further provides that a minor between the age of sixteen and eighteen "may be employed during periods when the minor is not legally required to attend school or when the minor is excused by school authorities from attending school; provided that the employer of the minor records and keeps on file the number of a valid certificate of age issued to the minor by the department." Therefore, while the general rule is that minors are not permitted to be employed, employment for 16- or 17–year–old minors may be permitted where the statute allows, that is, when not legally required to attend school, or excused by school authorities.

Second, contrary to the majority's position, the legislative history does not indicate any intention to abrogate the infancy doctrine with respect to minors between sixteen and eighteen years old. In support of its contention, the majority cites to Hse. Stand. Comm.

Rep. No. 441, in 1969 House Journal, at 799. In pertinent part, that report states:

4. Modify Employment Certificate Requirements

A new concept *in work permit requirements* is proposed. Presently, before a minor can be put to work, his prospective employer must first get an employment certificate for him. The certificate is returned by the employer to the [DLIR] for cancellation when the minor terminates employment. This procedure is repeated if the minor changes employer or is reemployed later by his former employer. Under the proposed revision, a 16– or 17–year–old minor, would be issued an age certificate without regard to occupation or employer. This age certificate (wallet size) would be valid for any legal employment *unless invalidated in the best interests of a minor as to specific employment.* An employer, upon hiring a 16– or 17–year–old minor, would be required to record and keep on file the number of the certificate of age and insure that the minor is not legally required to be in school. *This modification would benefit minors and employers and appreciable savings in man hours and forms would accrue to the State.*

(Emphases added.) Hence, as the legislative history to HRS chapter 390 demonstrates, the purpose of the amendments is to require that an "age certificate" be obtained in lieu of a work certificate that would otherwise necessitate frequent updating and renewal with the DLIR. However, nothing in the legislative history indicates that the child labor statutory scheme would otherwise supersede the infancy doctrine.[6]

As the majority observes, the legislature has limited the application of the infancy doctrine, but only in discrete and expressly defined areas. Majority opinion at 526–27, 135 P.3d at 135–36. *See* HRS § 577A–2

(1993) (barring later disaffirmance by a minor for contracts involving the receipt of medical care and services); HRS § 577–26 (1993) (prohibiting disaffirmance by a minor with respect to contracts involving alcohol and drug counseling services). Unlike these statutes, HRS chapter 390 is devoid of any like language. Because disaffirmation of an employment contract has not been expressly barred by the legislature, such disaffirmation has not been prohibited by it. *See Burns Int'l Sec. Servs., Inc. v. Dep't of Transp.,* 66 Haw. 607, 611, 671 P.2d 446, 449 (1983) (stating that "statutes in derogation of common law must be strictly construed"); *Fonseca v. Pac. Constr. Co.,* 54 Haw. 578, 585, 513 P.2d 156, 160 (1973) (noting the continuing applicability of the maxim that "statutes abrogating common law rights must be strictly construed"); *Akai v. Lewis,* 37 Haw. 374, 377 (1946) (concluding that an ordinance in derogation of the common law will be strictly construed and positing that "under the rule of strict construction it is not to be presumed that the lawmakers intended to abrogate or modify a rule any further than that which is expressly declared or clearly indicated"). In addition, "[w]here it does not appear there was legislative purpose in superseding the common law, the common law will be followed." *Burns,* 66 Haw. at 611, 671 P.2d at 449. *See also Watson v. Brown,* 67 Haw. 252, 686 P.2d 12 (1984) (stating that "[a] statutory remedy is, as a rule, merely cumulative and does not abolish an existing common law remedy unless so declared in express terms or by necessary implication").

The issue is not whether Appellant is precluded from employment, as the majority would have it but, rather, whether Appellant may disaffirm the terms of his employment contract. By permitting employment for 16– and 17–year–old minors, but not prohibiting disaffirmance of such contracts, as it has in other instances, the legislature in HRS chapter 390 did not abrogate the common law

---

**6.** A review of the language in Hse. Stand. Comm. Rep. No. 441, in 1969 House Journal, at 798–99 similarly does not support the majority's proposition that HRS chapter 390 supercedes the common law infancy doctrine. In general, the committee report enumerates the purposes of the amendments to the child labor laws, none of which discuss the infancy doctrine, as follows:

1) clearly define applicable terms used in this bill to facilitate its administration; 2) establish additional exemptions from the child labor law; 3) relax certain work hours restrictions; 4) modify employment certificate requirements; and 5) eliminate an apparent "age incompatibility" between the existing law and the compulsory school age attendance law.

542

rule that contracts of employment entered into by minors are voidable, rather than void. Hence, HRS chapter 390 does not, as the majority contends, "render[ ] inapplicable the general rule that contracts entered into by minors are voidable in the employment context." Majority opinion at 529, 135 P.3d at 138. Such a reading extends application of the child labor laws far beyond legislative expression, and runs afoul of the infancy doctrine.

## IV.

More troubling, the majority's approach indicates that a minor may be required to submit to a voidable arbitration clause or give up his right to sue for sexual harassment.[7] Such a proposition would be inimical to the enforcement of civil rights in the employment area. *See* Haw. Const. Art. I § 5 (stating that the Hawai'i Constitution mandates that an individual will not "be denied the enjoyment of the person's civil rights or be discriminated against"); Stand. Comm. Rep. No. 372, in 1989 House Journal, at 984 (the legislature adopted HRS chapter 368 to provide "a forum [in the form of the HCRC]" with the intent to "establish a strong and viable [HCRC] with sufficient ... enforcement powers to effectuate the State's commitment to preserving the civil rights of all individuals"). Thus I believe that insofar as *Brown* extends to this case, *Brown* should be reexamined. *See Stroupes*, 2005 WL 1363573 (upholding right to sue under Civil Rights Act of 1964 in light of minor's right to

void arbitration agreement despite Federal Arbitration Act).

As mentioned before, originally Appellant filed his complaint with the HCRC. Subsequently, pursuant to HRS § 368–12, Appellant requested that his HCRC complaint be withdrawn in order for him to pursue the matter *in court*. *See* HRS § 368–12 (stating that the HCRC "may issue a notice of right to sue upon written request of the complainant" after which, within a ninety day period, "the complainant may bring a civil action under this chapter"). The right to sue in court includes the right to a jury trial, a right at the least afforded by HRS chapter 368 and article I, section 13 of the Hawai'i Constitution.

Although our courts have recognized that the right to a jury trial in civil cases may be waived, *Joy A. McElroy, M.D., Inc. v. Maryl Group, Inc.*, 107 Hawai'i 423, 428–29, 114 P.3d 929, 934–35 (App.2005), there is no indication in this case that Appellant waived such right. *See Lii v. Sida of Hawaii, Inc.*, 53 Haw. 353, 355, 493 P.2d 1032, 1033 (1972) (stating that the supreme court "will indulge every reasonable presumption against the waiver" of the right to a jury trial); HRS § 635–13 (Supp.2005) (stating that "[w]hen the right of trial by jury is given by the Constitution or a statute of the United States or this State and the right has not been waived, the case *shall* be tried with a jury" (emphasis added)). In fact, Appellant demanded a jury trial.[8] [R at 1–14]

7. I note, in part, that such an issue was not extensively discussed in *Brown v. KFC Nat'l Mgmt. Co.*, 82 Hawai'i 226, 238 n. 14, 921 P.2d 146, 158 n. 14 (1996), and, of course, not with respect to contracting with a minor.

8. Nothing in the record indicates that Appellee raised the issue of arbitrability of Appellant's claims. Appellee's Answer in the court did not raise an arbitration defense. Appellee's Responsive Pretrial Statement contains no reference to arbitration. Thus, although required to do so under Rule 12 of the Hawai'i Rules of the Circuit Court, Appellant failed to mention the arbitrability of the current dispute until it filed its motion to compel arbitration, after the Appellant's filing of his complaint and pretrial statement, and after significant discovery had already been conducted.

In pertinent part, Rule 12(b) of the Rules of the Circuit Courts of the State of Hawai'i (2006)

provides, *inter alia*, that a pretrial statement and responsive pretrial statement "*shall* contain the following information":

(3) *All claims for relief and all defenses advanced by the party submitting the pretrial statement* and the type of evidence expected to be offered in support of each claim and defense;

....

(6) A statement that each party, or the party's lead counsel, conferred in person with the opposing party, or with lead counsel of each opposing party, in a good faith effort to limit all disputed issues, including outstanding discovery, and *considered the feasibility of settlement and alternative dispute resolution options.*

...

(7) *A statement identifying any party who objects to alternative dispute resolution and the reasons for objecting. If the parties have agreed to an alternative dispute resolution process, a statement identifying the process.*

Similar circumstances arose in *Prudential Ins. Co. of Am. v. Lai*, 42 F.3d 1299, 1301 (9th Cir.1994). In that case the plaintiffs-employees sued their employer and supervisor in state court for state law claims alleging that their supervisor had raped, harassed, and sexually abused them.[9] Upon being hired, plaintiffs had signed "U–4 forms" which contained an arbitration clause. *Id.* Subsequent to their hiring, the plaintiffs had registered with the National Association of Securities Dealers (NASD), an association that requires that disputes "arising in connection with the business" of its members be submitted to arbitration. *Id.* The employer filed an action in federal district court seeking to compel arbitration of the plaintiffs' state law claims and to stay court proceedings pursuant to the Federal Arbitration Act. *Id.* The district court granted the employer's motion. *Id.*

On appeal, the Ninth Circuit Court of Appeals reversed. It recognized that an arbitration provision does not preclude a plaintiff from seeking remedies in a judicial forum:

> Legislative enactments in this area have long evinced a general intent to accord parallel or overlapping remedies against discrimination. In the Civil Rights Act of 1964, Congress indicated that they considered the policy against discrimination to be of the "highest priority." *Consistent with this view, Title VII provides for consideration of employment discrimination claims in several forums. And, in general submission of a claim to one forum does not preclude a later submission to another. Moreover, the legislative history of Title VII manifests a congressional intent to allow an individual to pursue independently his rights under both Title VII and other applicable state and federal statutes.*

*Id.* (quoting *Alexander v. Gardner*, 415 U.S. 36, 47–48, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974) (emphases added)). That court indicated that the public policy against sexual

(Emphases added.)

**9.** The Ninth Circuit in *Prudential Ins. Co. of America v. Lai*, 42 F.3d 1299 (9th Cir.1994) observed that "[p]arallel state anti-discrimination laws are explicitly made part of Title VII's enforcement scheme." *Id.* at 1303 n. 1 (citing

discrimination was at least as weighty as the policy favoring arbitration.

> This congressional concern that Title VII disputes be arbitrated only "where appropriate," and only when such a procedure was knowingly accepted, reflects our public policy of protecting victims of sexual discrimination and harassment through the provisions of Title VII and analogous state statutes. *See Alexander [v. Gardner–Denver Co.,]* 415 U.S. [36,] 47[, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974) ]. This is a policy that is at least as strong as our public policy in favor of arbitration.

*Id.* at 1305.

In doing so, the Ninth Circuit observed that "the remedies and procedural protections available in the arbitral forum can differ significantly from those contemplated by the legislature. In the sexual harassment context, these procedural protections may be particularly significant." *Id.* at 1305. The *Lai* court noted that *"in an area as personal and emotionally charged as sexual harassment and discrimination, the procedural right to a hearing before a jury of one's peers, rather than a panel of the [NASD], may be especially important."* *Id.* at 1305 n. 4 (emphasis added).

*Lai* concluded that the plaintiffs could only be compelled to forego their statutory remedies if they knowingly agreed to submit such disputes to arbitration. *Id.* The *Lai* court ruled that the plaintiffs did not knowingly agree to submit to arbitration and were therefore not bound by the agreement in that case. *Id.* It said:

> We agree with [plaintiffs] that Congress intended there to be at least a knowing agreement to arbitrate employment disputes before an employee may be deemed to have waived the comprehensive statutory rights, remedies and procedural protections prescribed in Title VII and related state statutes. Such congressional intent, which has been noted in other judicial deci-

*Kremer v. Chem. Const. Corp.*, 456 U.S. 461, 477, 102 S.Ct. 1883, 72 L.Ed.2d 262 (1982)). Accordingly, "the Federal Arbitration Act has the same application to state law claims ... as it does to Title VII claims." *Id.*

sions, is apparent from the text and legislative history of Title VII. *Id.* at 1304. A review of the arbitration clause in this case does not evince any "knowing . . . waive[r by Appellant of] the comprehensive statutory rights, remedies and procedural protections prescribed in . . . related state statutes" *id.* such as HRS § 378–2.[10] The arbitration clause herein, then, could not have precluded his court action.

## V.

As to the second point, the established principle that conditional language must be construed against the employer that used it should control in this case.

### A.

A review of the express language of the Handbook indicates that its entire contents are subject to unilateral modification by Appellee. The Handbook's preface states that "[Appellee] maintains the responsibility and the *right to make changes at any time* and will advise employees when changes occur." (Emphasis added.) [RA at 169] Following that provision, the Handbook advises that "the guidelines and procedures [contained therein] *may change* . . . from time to time." (Emphasis added.) [RA at 170]. These introductory remarks, then, qualify and condition the provisions in the Handbook that follow.

Such language is reiterated in the acknowledgment form signed by Appellant, declaring that Appellee "has the right to change this handbook *at any time and without advance notice.*" (Emphasis added.) The acknowledgment form further notifies the employee that its provisions are "presented as a matter of information only and do not constitute an employment contract." To dispel any other construction that may be given it, the Handbook indicates the guidelines "are not conditions of employment." The terms of the Handbook thus lack the bilateral consider-

ation necessary for the formation of a contract, as the majority indicates. Majority opinion at 532–34, 135 P.3d at 141–44. Inasmuch as the arbitration provision is a part of the Handbook, that section, then, is non-binding. *See Wayland Lum Const., Inc. v. Kaneshige,* 90 Hawai'i 417, 422, 978 P.2d 855, 860 (1999) (stating that "an arbitration agreement should be construed as a whole, and its meaning determined from the entire context"); *cf. In re Lock Revocable Living Trust,* 109 Hawai'i 146, 152, 123 P.3d 1241, 1247 (2005) (ruling that "in construing a trust document to determine the settlor's intent, the instrument must be read as a whole, not in fragments").

### B.

Moreover, the seemingly mandatory language of the arbitration agreement, when viewed with the non-binding language of the Handbook, raises an ambiguity as to the effect of the arbitration provision. The arbitration section in this case provides that "[a]ny and all claims arising out of the employee's employment with [Appellee] and his [or] her termination *shall* be settled by final binding arbitration[.]" Majority opinion at 523, 135 P.3d at 132 (emphasis added). The section goes on to state that "[a]ny claim *must* be presented for arbitration[.]"[11] *Id.* (emphasis added).

We recently held in *Luke v. Gentry Realty, Ltd.,* 105 Hawai'i 241, 249, 96 P.3d 261, 269 (2004), that, in a case involving a dispute regarding a home sales agreement, an ambiguity existed within that agreement where one provision stated that a buyer may "pursue any remedies available at law or in equity," and the other read that disputes "shall be resolved by arbitration." In *Luke,* we concluded that "in interpreting contracts, ambiguous terms are construed against the party who drafted the contract[,]" *id.* (citing *Gushiken v. Shell Oil Co.,* 35 Haw. 402, 416 (1940)), and held that, in light of the ambiguity, the court in that case erred in staying judicial proceedings pending arbitration.

---

**10.** HRS § 378–2 prohibits "unlawful discriminatory practice[s] . . . [b]ecause of race, sex, sexual orientation, age, religion, color, ancestry, disability, marital status, or arrest and court record."

**11.** The arbitration agreement provision further states that "[t]he parties agree not to institute any action in any court located in the State of Hawaii or elsewhere against the other arising out of the claims covered by this paragraph."

Similarly, here, such an ambiguity must be resolved against the source of the handbook, the employer Appellee. *See Amfac, Inc. v. Waikiki Beachcomber Inv. Co.*, 74 Haw. 85, 110 n. 5, 839 P.2d 10, 25 n. 5 (1992) (noting that "the fundamental principle that any ambiguities in a contract should be interpreted most strongly against the party who has drafted the language is applicable ... where a contract is open to more than one reasonable construction"); *cf. Oahu Transit Serv., Inc. v. Northfield Ins. Co.*, 107 Hawai'i 231, 235–36, 112 P.3d 717, 721–22 (2005) (holding that ambiguities arising from an insurance policy should be construed in favor of the insured, and explaining that "ambiguity exists and the rule is followed only when the policy *taken as a whole*, is reasonably subject to differing interpretations" (emphasis added)). In light of the ambiguity the arbitration language must be viewed as directory rather than mandatory.

## VI.

The majority recognizes that despite the existence of non-binding language which renders the arbitration clause unenforceable in this case, this court in *Brown* enforced an arbitration agreement in that case which contained similar language. *See* majority opinion at 534, 135 P.3d at 143 (pointing out that, in *Brown*, this court noted the arbitration provision in that case said "that '[a]ll such materials are presented for informational purposes only and can be changed at any time by KFC, with or without notice[,]' " (quoting *Brown*, 82 Hawai'i at 229, 921 P.2d at 149), but explaining that "inasmuch as the *Brown* court severed the arbitration provision from the application and found it enforceable standing on its own, *Brown* is consistent with our holding today"). This court concluded in *Brown* that the employee's racial discrimination claim fell within the arbitration clause of the employment application and granted the employer's motion to compel arbitration.

But plainly, such language conflicts with the compulsory enforcement of an arbitration clause as the majority itself has pointed out. Because of the conflict between *Brown* and the majority's holding in this case, I believe *Brown* should not control. The fact that *Brown* is "remarkably similar" to *Patterson v. Tenet Healthcare, Inc.*, 113 F.3d 832 (8th Cir.1997), majority opinion at 533, 135 P.3d at 143, does not make it any less inconsistent with the holding here. The majority's acknowledgement that a seeming discrepancy between this case and *Brown* results because *Brown* also contained non-binding language, *id.* at 533, 135 P.3d at 143, is precisely why *Brown* should be confined to its own facts. By limiting *Brown*, the majority would avoid the situation it posits, that is, of placing the onus on employees to discern what the employer meant in the employer's handbook. Majority opinion at 531–33, 135 P.3d at 140–42.

## VII.

In sum, in contrast to the rule employed in *Luke*, the majority relies on various indicia to determine whether the arbitration clause is enforceable or not, such as whether the arbitration agreement section was "buried," the acknowledgment form was drafted in relation to that section, the arbitration agreement was "boxed off," *Brown*, 82 Hawai'i at 229, 921 P.2d at 149, or words were capitalized or bolded. Majority opinion at 531, 532–33, 135 P.3d at 140, 141–42. With all due respect, the enumeration of such indicia lacks a unifying principle.

The want of such a principle places an unwarranted burden on employees of deciphering at their risk such parts of the employer's handbook that later may be found to be legally binding as opposed to those provisions which are not binding, despite the non-binding language typical of such handbooks. The formulation applied by the majority is not practical, realistic, or just; the principle that any ambiguity in a document is to be construed against its source is. Under that principle, the arbitration provision must be construed against Appellee as directory, not mandatory, and, thus, not legally enforceable.