**FOR PUBLICATION IN WEST'S HAWAIʻI REPORTS AND PACIFIC REPORTER**

Electronically Filed
Intermediate Court of Appeals
CAAP-10-0000046
30-OCT-2013
09:47 AM

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAIʻI

---oOo---

SAFEWAY, INC., Plaintiff-Appellee,
v.
NORDIC PCL CONSTRUCTION, INC., a Hawaii
corporation, Defendant-Appellant,
and
VERSAFLEX INCORPORATED, a Missouri corporation,
CB TECH SERVICES, INC., a Hawaii corporation,
HAWAII NUT & BOLT, INC., a Hawaii corporation,
CASCADE INDUSTRIES, INC., a Hawaii corporation,
Defendants-Appellees
and
JOHN DOES 1-50, JANE DOES 1-50, DOE PARTNERSHIPS 1-50,
DOE CORPORATIONS 1-50, DOE ENTITIES 1-50, Defendants

and

CASCADE INDUSTRIES, INC., Third-Party Plaintiff-Appellee,
v.
GRANT HENRY, DIVISION SEVEN CONSULTING OF HAWAII, INC.,
Third-Party Defendants-Appellee,
and
JOHN DOES 2-50, JANE DOES 2-50, DOE PARTNERSHIPS 1-50,
DOE CORPORATIONS 2-50, and DOE ENTITIES 1-50,
Third-Party Defendants

and

VERSAFLEX INCORPORATED, a Missouri corporation,
Third-Party Plaintiff-Appellee,
v.
BENNER STANGE ASSOCIATES ARCHITECTS, INC.,
Third-Party Defendant-Appellee

NO. CAAP-10-0000046

APPEAL FROM THE CIRCUIT COURT OF THE FIRST CIRCUIT
(CIVIL NO. 09-1-1414)

OCTOBER 30, 2013

LEONARD, PRESIDING JUDGE, REIFURTH AND GINOZA, JJ.

OPINION OF THE COURT BY REIFURTH, J.

Defendant-Appellant Nordic PCL Construction, Inc. ("Nordic") seeks to enforce a contractual provision requiring arbitration of disputes relating to performance of three construction contracts entered into between Nordic and Plaintiff-Appellee Safeway Inc. ("Safeway") for the construction of a Safeway Store and retail shops on Kapahulu Avenue. Safeway contends that a set of supplemental conditions formed part of the contract for the project, and that those conditions expressly deleted the arbitration clause. The Circuit Court of the First Circuit ("Circuit Court")[1] declined to enforce the arbitration provision, concluding that "the agreement itself is ambiguous[.]"

Nordic appeals from the July 1, 2010 order denying its application to compel arbitration, and the September 23, 2010 order denying its motion to clarify, amend, or reconsider the order denying the application to compel arbitration. Nordic alleges that the Circuit Court erred by (1) concluding in those orders that the supplementary conditions were part of the construction contract, and (2) denying Nordic's request for an evidentiary hearing.

We concur with the Circuit Court that there were genuine issues of material fact pertaining to the existence of an agreement to arbitrate, but conclude that the court should have held, and must now hold, an evidentiary hearing to promptly determine those issues.

---

[1] The Honorable R. Mark Browning presided.

2

I. BACKGROUND

In 2006, Safeway engaged Nordic as the prime general contractor for the construction of the Safeway Store #2747, retail shops, and related site improvements on Kapahulu Avenue, in Honolulu, Hawai'i (the "Project"). Shortly after the store opened, a waterproofing membrane installed on the parking deck, situated above the store, began to fail and water leaked into the store. Eventually, the parties to this appeal, as well as several others, sought to litigate responsibility for the failure as well as claims to monies withheld by Safeway.

A.    Nordic Receives the Bid and Contract Documents

In early 2006, Safeway, in the course of soliciting general contractors for the Project's construction, had its architect, Benner Stange Associates Architects, Inc. ("Benner"), assemble a project manual ("Project Manual"), consisting of standard forms prepared by Safeway and including a list of supplementary conditions ("Supplementary Conditions"), for distribution to prospective general contractors.[2/]  On or about February 6, 2006, Benner sent a copy of the Project Manual to Glen Kaneshige, then-President of Nordic.

Mr. Kaneshige described the section of the Project Manual entitled Bid Form and Supplements as including, among other things, "an unsigned eight-page document named 'Construction Contract,'" ("Initial Construction Contract"), "a nine-page document named 'General Conditions,'" ("General Conditions"), and the Supplementary Conditions. According to Mr. Kaneshige, "Nordic and Safeway never negotiated the terms of any of these documents, and they never became a part of the Parties' Contracts."

On April 10, 2006, Safeway notified Nordic that Nordic had been selected as the Project's general contractor. Safeway then provided Nordic with a set of documents, including a

---

[2/]    According to Francisco Varela, a former Benner architect who worked on the Project, "it is customary and typical for supplementary conditions to be in a project manual and for those supplementary conditions to modify the standard form A201 general conditions."

modified version of the Initial Construction Contract ("Modified Initial Construction Contract") and a document titled AIA Document A201-1997: General Conditions of the Contract for Construction with many edits, either by strike-through text (apparently deletions) or underlined text (apparently additions) ("A201 Document").  Safeway provided further copies of the Project Manual to Nordic in May and June 2006.

Final drafts of three contract documents, each entitled AIA Document A101-1997: Standard Form of Agreement Between Owner and Contractor were sent to Nordic by Safeway on or about October 2, 2006.  Each contract corresponded to one of three Project components - construction of the store site ("Site Contract"), the store itself ("Store Contract"), and associated retail shops ("Shops Contract") (collectively, the "A101 Documents").  Both the A101 Documents and the A201 Document were derived from form contracts commonly used in the construction industry.  The final drafts of the A101 and A201 Documents apparently replaced the Initial and Modified Initial Construction Contracts.  On November 17, 2006, Nordic sent fully executed copies of the A101 Documents to Safeway.

     B.     The Contract Documents

     The A101 Documents are the controlling contract documents; they also enumerate the documents that comprise the whole of the contract documents, including by reference to or incorporation of those other documents.  Although the A201 Document, which contains an arbitration provision, is referenced in the A101 Documents, the parties disagree over whether the A101 Documents also incorporate the Supplementary Conditions, which purport to delete the arbitration provision.  In relevant part, each of the three A101 Documents begins:

> ARTICLE 1  THE CONTRACT DOCUMENTS
>
> The Contract Documents consist of this Agreement, Conditions of the Contract (General, Supplementary and other Conditions), Drawings, Specifications, Addenda issued prior to execution of this Agreement, other documents listed in this Agreement and Modifications issued after execution of this Agreement; these form the Contract, and are as fully a part of the Contract as if attached to this Agreement or

4

repeated herein. . . . An enumeration of the Contract
Documents, other than Modifications, appears in Article 8.

Article 8 in each of the three A101 Document, entitled
Enumeration of Contract Documents, purports to enumerate the
specific documents that comprise the Contract Documents.  In the
Store Contract, Article 8 provides the following:[3]

ARTICLE 8   ENUMERATION OF CONTRACT DOCUMENTS

§ 8.1   The Contract Documents, except for Modifications
issued after execution of this Agreement, are enumerated as
follows:

. . .

§ 8.1.3   The Supplementary and other Conditions of the
Contract are those contained in the Project Manual dated ,
and are as follows:

Document                    Title                    Pages

. . .

§ 8.1.4   The Specifications are those contained in the
Project Manual dated as in Section 8.1.3, and are as
follows: *(Either list the Specifications here or refer to an
exhibit attached to this Agreement)*
Title of Specifications exhibit:   Exhibit A **attached hereto
and made a part hereof**.

§ 8.1.7   Other documents, if any, forming part of the
Contract Documents are as follows:

*(List here any additional documents that are intended to
form part of the Contract Documents.  AIA Document A201-1997
provides that bidding requirements such as advertisement or
invitation to bid, Instructions to Bidders, sample forms and
the Contractor's bid are not part of the Contract Documents
unless enumerated in this Agreement.  They should be listed
here only if intended to be part of the Contract Documents.)*

***Safeway Inc. (Nor/Cal) Modified AIA Document A201-1997
General Conditions of the Contract for Construction.***

Article 8 of each of the Shops and Site Contracts are identical
with the Store Contract, except for Section 8.1.3.  That section,
in both the Shops and Site Contracts, provides:

§ 8.1.3   The Supplementary and other Conditions of the
Contract are those contained in the Project Manual dated ,
and are as follows:

| Document | Title | Pages |
|---|---|---|
| Value Engineering | Safeway Kapahulu | 3 |
| Options | Store #2747 | |

---

[3]     Italics/boldface are as in the source document.  In comparing the
Store Contract to the A101 standard form contract, the underlined text are
additions made by Safeway.  Deletions are not shown.

The A201 Document is incorporated by Article 8, Section 8.1.7 in each A101 Document. Paragraph 4.6 of Article 4 of the A201 Document is titled Arbitration; it contains several subparagraphs. It begins:

> 4.6.1 Any Claim arising out of or related to the Contract [apart from certain exceptions] shall . . . be subject to arbitration. Prior to arbitration, the parties shall endeavor to resolve disputes by mediation in accordance with the provisions of Paragraph 4.5.

Subparagraph 4.6.6, relating to arbitration costs and fees was amended by Safeway as follows:[4]

> 4.6.6 Judgment on Final Award. The award rendered by the arbitrator or arbitrators shall be final, and judgment may be entered upon it in accordance with applicable law in any court having jurisdiction thereof. The Owner and the Contractor shall share equally the costs of any arbitration proceedings instituted under this Paragraph 4.6. In the event that either party finds it necessary to bring an action at law or other proceedings against the other to enforce the decision of the arbitrator, the prevailing party shall be paid at reasonable attorneys' fees incurred in bringing such action or proceedings.

The Project Manual is referenced in Sections 8.1.3 and 8.1.4 of the A101 Document as well as Subparagraph 1.1.7 of the A201 Document[5] and includes Supplementary Conditions. Each of the Project Manual's General Conditions[6] and Supplementary Conditions are contained in the record. In relevant part, the Supplementary Conditions provide:

> SC.1 SUPPLEMENTARY CONDITIONS
>
> The following supplements modify, change, delete from or add to the "General Conditions of Contract for Construction", AIA Document A201 – 1977, Fifteenth Edition. Where any article of the General Conditions is modified or any paragraph, subparagraph or clause thereof is modified or deleted by these supplements,

---

[4] The addition is underlined in the source.

[5] Subparagraph 1.1.7 is entitled "The Project Manual" and defines the Project Manual as "a volume assembled for the Work which may include the bidding requirements, sample forms, Conditions of the Contract and Specifications."

[6] These are *not* the same as the A201 Document, subtitled "General Conditions of Contract for Construction."

the unaltered provisions of that article, paragraph, subparagraph or clause shall remain in effect.

All divisions of the specifications shall be subject to the General Conditions and Supplementary Conditions.

SC.2   MODIFICATIONS TO ARTICLES OF THE GENERAL CONDITIONS

. . . .

2.17   ARTICLE 4 - ADMINISTRATION OF THE CONTRACT

4.6   Arbitration

Delete this paragraph in its entirety.

C.     Execution of the Contract Documents

Nordic began work on the Project before having signed any contract documents.  On November 16, 2006, Davin Ishii ("Ishii") of Nordic responded to an email from Jim Krieger of Safeway, who had encouraged Nordic to sign the contracts. Ishii's email reply stated:

Jim,

I just spoke with Glen [Kaneshige].  He will be signing the contract with the understanding that the unit prices, list of drawings, specifications, special clauses, exclusions, etc. . . . will be added into the contract documentation.

. . . .

Thank you,

Davin

One day later, Nordic signed the A101 Documents, backdating them to September 20 and 21, 2006.

D.     Motion to Compel Arbitration

Roughly one year later, a few months after the new store and shops had opened, the waterproofing on the rooftop parking deck began to fail and water began to leak into the store.  Eventually, in June 2009, Safeway filed suit against Nordic and its subcontractors and suppliers.

Nordic filed an application to compel arbitration ("Motion to Compel") on March 2, 2010, contending that an arbitration agreement existed in Paragraph 4.6 of the A201

Document. It further contended that the Supplementary Conditions were not incorporated into the Contract Documents. Safeway disputed Nordic's assertion, arguing that the Supplementary Conditions had been effectively incorporated into the Contract Documents, thereby negating the arbitration provision in the A201 Document.

On June 20, 2010, the Circuit Court held a hearing on Nordic's Motion to Compel. The Circuit Court expressed frustration regarding the lack of clarity in the contract: "[I]n trying to discern what the heck happened here and what the contract was, it was confusing as heck to me." Neither party requested, nor did the Circuit Court offer, an opportunity to present witnesses or additional evidence.

While not making any specific factual findings regarding incorporation, the Circuit Court determined that "[t]he agreement incorporates several documents[,]" including the "Supplementary and Other Conditions of Contract contained in the project manual[.]" As Section 8.1.3 of the A101 Documents was therefore applicable, the court concluded that it "cannot ignore either the deletion of the requirement of the arbitration contained in the project manual or the requirement of arbitration contained in the [A201 Document]. Therefore, because there's more than one reasonable interpretation of the arbitration agreement, the agreement itself is ambiguous." On that basis, citing applicable law, the court denied Nordic's Motion to Compel.

E.    Motion for Reconsideration

On July 14, 2010, Nordic filed its motion to clarify, amend, or reconsider the order denying Nordic's Motion to Compel ("Motion for Reconsideration"). It sought therein to have the Circuit Court either amend its previous order and compel the parties to arbitrate or to order "an evidentiary hearing to resolve issues of fact with respect to the [Motion to Compel]."

The Circuit Court denied the Motion for Reconsideration stating that it was not compelled to hold an evidentiary hearing, and contended that Nordic had received an evidentiary hearing of

8

sorts at the prior hearing on the Motion to Compel since the court had examined the evidence that was submitted at that time.

This appeal follows.

## II. STANDARD OF REVIEW

### A. Motion to Compel Arbitration

"A petition to compel arbitration is reviewed *de novo*[,]" which is the same standard "applicable to a motion for summary judgment[.]" *Brown v. KFC Nat'l Mgmt. Co.*, 82 Hawaiʻi 226, 231, 921 P.2d 146, 151 (1996). The appellate court reviews the trial court's decision "using the same standard employed by the trial court and based upon the same evidentiary materials" that were before the trial court in its "determination of the motion." *Id.* (quoting *Koolau Radiology, Inc. v. Queen's Medical Center*, 73 Haw. 433, 439-40, 834 P.2d 1294, 1298 (1992)) (internal quotation marks omitted). Furthermore:

> As a general rule, the construction and legal effect to be given a contract is a question of law freely reviewable by an appellate court. The determination whether a contract is ambiguous is likewise a question of law that is freely reviewable on appeal. These principles apply equally to appellate review of the construction and legal effect to be given a contractual agreement to arbitrate.

*Id.* at 239, 921 P.2d at 159 (internal quotation marks and citations omitted).

## III. DISCUSSION

Hawaii Revised Statutes ("HRS") § 658A-7 governs motions to compel arbitration:

> **Motion to compel or stay arbitration.** (a) On motion of a person showing an agreement to arbitrate and alleging another person's refusal to arbitrate pursuant to the agreement:
>
> . . . .
>
> (2)  If the refusing party opposes the motion, the court shall proceed summarily to decide the issue and order the parties to arbitrate unless it finds that there is no enforceable agreement to arbitrate.
>
> . . . .

> (c) If the court finds that there is no enforceable
> agreement, it shall not, pursuant to subsection
> (a) or (b), order the parties to arbitrate.

HAW. REV. STAT. § 658A-7 (Supp. 2012). Accordingly, "[w]hen presented with a motion to compel arbitration, the court is limited to answering two questions: 1) whether an arbitration agreement exists between the parties; and 2) if so, whether the subject matter of the dispute is arbitrable under such agreement." *Douglass v. Pflueger Hawaii, Inc.*, 110 Hawai'i 520, 530, 135 P.3d 129, 139 (2006) (quoting *Koolau Radiology, Inc.*, 73 Haw. at 445, 834 P.2d at 1300).

Here, the parties dispute only the first of these two questions. An arbitration agreement is itself a contract; its existence is therefore contingent on compliance with laws governing the formation of contracts. 6 C.J.S. *Arbitration* § 27 (2004); *see also Douglass*, 110 Hawai'i at 534, 135 P.3d at 144 (holding no arbitration agreement where the agreement failed for lack of assent). Furthermore, in Hawai'i, "in order to be valid and enforceable, an arbitration agreement must have the following three elements: (1) it must be in writing; (2) it must be unambiguous as to the intent to submit disputes or controversies to arbitration; and (3) there must be bilateral consideration." *Douglass*, 110 Hawai'i at 531, 135 P.3d at 140 (citing *Brown*, 82 Hawai'i at 238-40, 921 P.2d at 158-60).

In ruling on a motion to compel arbitration, "[a] trial court can only decide, as a matter of law, whether to compel the parties to arbitrate their dispute if there is no genuine issue of material fact regarding the existence of a valid agreement to arbitrate." *Koolau Radiology, Inc.*, 73 Haw. at 439, 834 P.2d at 1298 (citing *Par-Knit Mills, Inc. v. Stockbridge Fabrics Co.*, 636 F.2d 51, 54 (3d Cir. 1980)). Additionally, we note that Hawai'i has a strong policy favoring arbitration of disputes, although parties must nonetheless have agreed to arbitrate their disputes. *Douglass*, 110 Hawai'i at 530-31, 135 P.3d at 139-40.

A.   The Circuit Court's conclusion that the Motion to
     Compel must be denied was in error because it did not
     properly determine what constituted the contract, and
     in turn, whether there existed an unambiguous (or any)
     arbitration agreement.

Each party contends that it ought to have prevailed regarding Nordic's Motion to Compel; in doing so, the parties disagree as to the set of documents that comprise the Contract Documents and therefore disagree as to the existence of an arbitration agreement.  Their dispute focuses on whether Paragraph 4.6 of the A201 Document - the sole arbitration provision in the Contract Documents - is to be given effect or deemed stricken from the Contract Documents.  Nordic argues that the A201 Document is incorporated into the Contract Documents, that Paragraph 4.6 therein is an unambiguous arbitration agreement, and that the Contract Documents fail to effectively incorporate the Supplementary Conditions, which, in relevant part, purport to "delete [Paragraph 4.6] in its entirety." Safeway, to the contrary, argues that Section 8.1.3 of each of the A101 Documents does effectively incorporate the Supplementary Conditions, and that Supplementary Condition 2.17 therein operates to eliminate Paragraph 4.6 from the Contract Documents. Alternatively, Safeway argues that the Contract Documents fail to evidence an unambiguous intent to arbitrate, and concludes therefore that Hawai'i precedent compels this court to affirm the order denying Nordic's Motion to Compel.

We consider Safeway's alternative argument first to clarify that Hawai'i precedent regarding arbitration agreements does not readily determine the outcome of this case.  We then turn to the question of which documents comprise the Contract Documents in order to address whether the arbitration provision in Paragraph 4.6 remained intact and effective or was instead stricken entirely.

1.   Ambiguities or disputes as to whether the parties
     assented to an arbitration agreement do not
     necessarily render it ineffective.

Safeway cites to *Brown* and *Douglass* for the proposition that any ambiguity as to the parties' intent to arbitrate must

defeat a purported arbitration provision. Specifically, Safeway asserts that "[a]pplying the factors set forth in *Douglass* and *Brown* to the facts in this case, at minimum there would be no valid or enforceable agreement to arbitrate . . .," concluding that incorporation of the Supplementary Conditions, which purport to delete the arbitration provision, defeats the required "manifestation of an unambiguous intent to arbitrate."

We disagree with the contention that *Douglass* and *Brown* alone settle this case, as they implicate not only whether an aribtration provision itself manifests unambiguous intent, but also consideration of whether the parties assented to an arbitration agreement. Mere ambiguity as to assent, or as to whether the parties intended to accept, an arbitration agreement, is not enough to defeat such an agreement.

In *Brown*, the Hawai'i Supreme Court considered a challenge to an arbitration provision contained in an employment application. 82 Hawai'i at 228-29, 921 P.2d at 148-49. The signed application specified that it did not constitute an employment contract, but a separately-signed subsection within the application contained a purportedly binding arbitration provision. The court deemed the employee to be employed pursuant to an oral contract, while holding that the arbitration provision in the application constituted a written arbitration agreement. Having thus determined that the writing requirement for arbitration agreements was satisfied,[1] it proceeded to uphold the arbitration agreement as valid because, in addition to being supported by bilateral consideration, the arbitration provision was "manifestly unambiguous in its expressed intent that . . . disputes be arbitrated rather than resolved via resort to the . . . court[s]." 82 Hawai'i at 237-39, 921 P.2d at 157-59.

---

[1] *See* 9 U.S.C. § 4 (1994). In *Brown*, the Court had determined that the Federal Arbitration Act was applicable, and that to the extent its application was less restrictive than Hawai'i arbitration statutes, it preempted those statutes. *See* 82 Hawai'i at 238-39 & n.15, 921 P.2d at 158-59 & n.15. This was significant in *Brown* because of the oral nature of the employment relationship vis-à-vis the writing requirement mandated by both federal and state arbitration statutes, *compare* 9 U.S.C. § 4, *with* HAW. REV. STAT. § 658-1 (1993) (repealed 2002), but is not germane here.

12

Subsequently, in *Douglass*, the Supreme Court considered a challenge to another "manifestly unambiguous" arbitration provision. *Douglass*, 110 Hawai'i at 532, 135 P.3d at 141. The *Douglass* court described its holding in *Brown* as follows:

> We held in *Brown* that, in order to be valid and enforceable, an arbitration agreement must have the following three elements: (1) it must be in writing; (2) it must be unambiguous as to the intent to submit disputes or controversies to arbitration; and (3) there must be bilateral consideration.

*Id.* at 531, 135 P.3d at 140. Additionally, *Douglass* recognized that despite satisfaction of each of these conditions, surrounding circumstances in a case may reveal the lack of "mutual assent . . . to arbitrate." *Id.* at 532-33, 135 P.3d at 141-42. This was particularly relevant in *Douglass* where the arbitration provision in question was "buried" within a sixty-page employee handbook, the employee's signature merely acknowledged receipt of the handbook and an understanding of the items presented to him, and the signed acknowledgment provision emphasized the non-contractual nature of the handbook and did not call any attention to the arbitration provision. *Id.*

Thus, the court's challenge was to determine the effect of the signed acknowledgment provision as to the handbook's arbitration provision. *Douglass* concluded that, in light of the entirely inconspicuous nature of the arbitration provision and the lack of any evidence indicating that the employee had ever been apprised of it, the signature was not a manifestation of assent to the arbitration provision and that, therefore, the "[employee] cannot be compelled to arbitrate his claims[.]" *See id.* at 534, 135 P.3d at 143).

*Douglass* thus compels us here to perform two inquiries. First, does the arbitration agreement satisfy the three *Brown* conditions? As to the intent inquiry in the *Brown* test, arbitration agreements themselves must clearly manifest the intent to submit disputes to binding arbitration. *See Douglass*, 110 Hawai'i at 531-32, 135 P.3d at 140-41; *Brown*, 82 Hawai'i at 239, 921 P.2d at 159; *see also, e.g., Luke v. Gentry Realty, Ltd.*, 105 Hawai'i 241, 249, 96 P.3d 261, 269 (2004) (declining to

enforce an arbitration agreement in light of conflicting
provisions regarding dispute resolution options in a contract).
Second, does the arbitration agreement fail for lack of assent?
These inquiries are consistent with general principles regarding
the existence, validity, and enforceability of arbitration
agreements. *See* 6 C.J.S. *Arbitration* § 26 ("[N]o particular
words are necessary [to give effect to an arbitration agreement]
. . . [but] it must clearly appear that the intention of the
parties was to submit their differences to the arbitrators and to
be bound by their decision." (footnotes omitted)); 6 C.J.S.
*Arbitration* § 28 ("There must be mutual assent to an agreement to
arbitrate.").

The mere fact that assent to an arbitration agreement
is at issue does not necessarily defeat the agreement. In both
*Brown* and *Douglass*, the ambiguous intent inquiry focused on the
text of the arbitration provision itself. In each case, the
supreme court found that the provisions were manifestly
unambiguous as to the intent to arbitrate. *Douglass*, 110 Hawai'i
at 531, 135 P.3d at 140; *Brown*, 82 Hawai'i at 239, 921 P.2d at
159. In *Douglass*, however, while the court found assent to be at
issue, it did not end its inquiry there. Rather, it proceeded to
resolve whether the parties did in fact assent to the arbitration
agreement,[8/] just as with any question regarding assent to a
contract provision. *See, e.g., Earl M. Jorgensen Co. v. Mark
Const., Inc.*, 56 Haw. 466, 470-72, 540 P.2d 978, 982-83 (1975).

If all that were required to defeat an arbitration
agreement was to put assent at issue (or to put at issue the
parties' intent to accept that agreement, *see Earl M. Jorgensen
Co.*, 56 Haw. at 470-71, 540 P.2d at 982 (relating mutual assent
to an intent to accept)), arbitration agreements would be
peculiarly vulnerable and easily defeated. Such impairment
accords with neither the strong policy favoring arbitration, *see*

---

[8/]    While the supreme court appeared to view its assent inquiry as an
aspect of the inquiry regarding the second *Brown* factor (*i.e.*, ambiguity of
the arbitration agreement's expressed intent), we understand these to be
distinct inquiries, as performed in *Douglass*, such that a finding of ambiguity
as to assent does not defeat the arbitration agreement (whereas ambiguity as
to expressed intent of the arbitration agreement itself would do so).

*Douglass*, 110 Hawai'i at 530-31, 135 P.3d at 139-40, nor the principle that arbitration agreements should be on equal footing with other contract provisions, *cf. Brown*, 82 Hawai'i at 240, 921 P.2d at 160 ("[T]he [Federal Arbitration Act] 'was designed . . . to place arbitration agreements upon the same footing as other contracts.'" (quoting *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 510-11 (1974))).

Here, there is no question that Paragraph 4.6, the arbitration provision, is in writing, is supported by bilateral consideration, and unambiguously mandates arbitration of disputes. What is in question is whether the parties assented to the incorporation of the Supplementary Conditions into the Contract Documents, which, if so, would have the effect of deleting Paragraph 4.6 from the A201 Document.[9] While this is not directly a question of assent to the arbitration provision itself – it is instead a question of whether the parties indirectly assented to the deletion of the arbitration provision by way of assenting to incorporation of the Supplementary Conditions as a whole – we see no reason to regard it as anything but a question of the parties' assent.

That there is a question, an ambiguity, as to assent does not end our inquiry. Rather, it focuses our inquiry on precisely that question, which we turn to next.

> 2.  Because there are disputed issues of material fact regarding whether the parties assented to incorporation of the Supplementary Conditions, we cannot determine as a matter of law that the arbitration agreement should be enforced.

Whether the arbitration agreement exists and is enforceable turns on whether the Supplementary Conditions form a part of the Contract Documents. If they do, then, per Supplementary Condition 2.17, the arbitration agreement is deleted from the A201 Document. If they do not, then Paragraph

---

[9] Or, at minimum, those provisions addressing arbitration – Supplementary Condition 2.17 and Paragraph 4.6 – would result in an ambiguous, and therefore unenforceable, arbitration agreement. *See Luke*, 105 Hawai'i at 249, 96 P.3d at 269.

4.6 remains intact, forms the whole of the arbitration agreement, and is valid and enforceable as such.

In order to effectively incorporate by reference a separate writing, or a portion thereof, into a contract, "the language used . . . must explicitly, or at least precisely, identify the written material being incorporated and must clearly communicate that the purpose of the reference is to incorporate the referenced material into the contract (rather than merely to acknowledge that the referenced material is relevant to the contract, e.g., as background law or negotiating history)." *Northrop Grumman Info. Tech. Inc. v. United States*, 535 F.3d 1339, 1345 (Fed. Cir. 2008); *see also Ingersoll-Rand Co. v. El Dorado Chem. Co.*, 283 S.W.3d 191, 233 (Ark. 2008) ("[A] majority of states have concluded that the contract must clearly and specifically reference the document to be incorporated."); *Mgmt. Comp. Controls, Inc. v. Charles Perry Const., Inc.*, 743 So. 2d 627, 631 (Fla. Dist. Ct. App. 1999) ("A document may be incorporated by reference . . . if the contract specifically describes the document and expresses the parties' intent to be bound by its terms."); 17A C.J.S. *Contracts* § 402 (In order to incorporate a separate document by reference into a contract, the reference "must be clear and unequivocal, and the terms of the incorporated document must be known or easily available to the [contracting] parties."). "At common law, '[i]n order to uphold the validity of terms incorporated by reference it must be clear that the parties to the agreement had knowledge of and assented to the incorporated terms.'" *PaineWebber Inc. v. Bybyk*, 81 F.3d 1193, 1201 (2d Cir. 1996) (quoting *Lamb v. Emhart Corp.*, 47 F.3d 551, 558 (2d Cir. 1995)); *accord Ingersoll-Rand Co.*, 283 S.W.3d at 233.

"Although it is clear that whether one agreement has incorporated another has factual components, whether material has been incorporated presents a question of law." 11 Richard A. Lord, *Williston on Contracts* § 30:25, at 308 (4th ed. 2012); *see also Lamb*, 47 F.3d at 558 ("Evidence of . . . assent may be found in the circumstances surrounding the agreement."); *Douglass*, 110 Hawaiʻi at 532, 135 P.3d at 141 (determining the issue of mutual

assent "in combination with the surrounding circumstances presented in the case").

The Circuit Court's initial task - as now is ours - was to ascertain whether it could rule that, as a matter of law, the parties had an agreement to arbitrate. *Koolau Radiology, Inc.*, 73 Haw. at 439, 834 P.2d at 1298. That question hinged on whether the Supplementary Conditions had, as a matter of law, been incorporated into the Contract Documents. If the Circuit Court could so conclude that they were not incorporated, then the arbitration provision would unambiguously provide for arbitration as the means to resolve disputes. If the Circuit could so conclude that they were incorporated, then the arbitration provision would be nullified by the Supplementary Conditions.[10/] If, however, because of the existence of genuine issues of material fact, it could not conclude either way as a matter of law, then it would remain to resolve those factual issues in order to answer the question of incorporation. *See* Part IV.B *infra*.

Article 1 in each of the A101 Documents contains an integration clause:

> ARTICLE 1  THE CONTRACT DOCUMENTS
>
> The Contract Documents consist of this Agreement, Conditions of the Contract (General, Supplementary and other Conditions), Drawings, Specifications, Addenda issued prior to execution of this Agreement, other documents listed in this Agreement and Modifications issued after execution of this Agreement; these form the Contract, and are as fully a part of the Contract as if attached to this Agreement or repeated herein. The Contract represents the entire and integrated agreement between the parties hereto and supersedes prior negotiations, representations or agreements, either written or oral. An enumeration of the Contract Documents, other than Modifications, appears in Article 8.

In addition to identifying the types of documents constituting the Contract Documents, the provision points to Article 8 as enumerating the constituent documents.

---

[10/]    Or, at minimum, the arbitration provision would no longer unambiguously manifest an intent to arbitrate, and would therefore be without effect. *See Douglass*, 110 Hawai'i at 531, 135 P.3d at 140.

Article 8 provides that[11]:

§ 8.1   The Contract Documents, except for Modifications issued after execution of this Agreement, are enumerated as follows:

§ 8.1.1   The Agreement is this executed 1997 edition of the Standard Form of Agreement Between Owner and Contractor, AIA Document A101-1997 **as revised by Safeway Inc.**

§ 8.1.2   The General conditions are the 1997 edition of the General Conditions of the Contract for Construction, AIA Document A201-1997 **as revised by Safeway Inc.**

§ 8.1.3   The Supplementary and other Conditions of the Contract are those contained in the Project Manual dated , and are as follows:

| Document | Title | Pages |
|----------|-------|-------|

§ 8.1.4   The Specifications are those contained in the Project Manual dated as in Section 8.1.3, and are as follows: *(Either list the Specifications here or refer to an exhibit attached to this Agreement.)* Title of Specifications exhibit:   Exhibit A **attached hereto and made a part hereof.**

§ 8.1.5   The Drawings are as follows, and are dated unless a different date is shown below: *(Either list the Drawings here or refer to an exhibit attached to this Agreement.)* Title of Drawings exhibit:   **attached hereto and made a part hereof.**
§ 8.1.6   The Addenda, if any are as follows:

| Number | Date | Pages |
|--------|------|-------|

Portions of Addenda relating to bidding requirements are not part of the Contract Documents unless the bidding requirements are also enumerated in this Article 8.

§ 8.1.7   Other documents, if any, forming part of the Contract Documents are as follows:

*(List here any additional documents that are intended to form part of the Contract Documents.  AIA Document A201-1997 provides that bidding requirements such as advertisement or invitation to bid, Instructions to Bidders, sample forms and the Contractor's bid are not part of the Contract Documents unless enumerated in this Agreement.  They should be listed here only if intended to be part of the Contract Documents.)*

---

[11]   Each of the A101 Documents, including Article 8, was derived from a template document, intended to be customized by parties wishing to use the contract.  Except for language that is underlined and/or in boldface above, the language in Article 8 is the same language as in the template.  In particular, Section 8.1.3, as it appears above, is precisely as it is in the template document and in the Store Contract.  The only difference as to Article 8 between the Store, Shops, and Site Contracts, as discussed *supra* Section I.B., is Section 8.1.3.

*Safeway Inc. (Nor/Cal) Modified AIA Document A201-1997*
*General Conditions of the Contract for Construction.*

Nordic argues that Section 8.1.3 is ineffective to incorporate the Supplementary Conditions because it does not clearly and unequivocally define what is to be incorporated.[12] However, cases where incorporation is found ineffective as a matter of law generally turn on such facts as whether a document reference is simply too "amorphous . . . [to] guide the reader to the incorporated document," *Chan v. Drexel Burnham Lambert, Inc.*, 178 Cal. App. 3d 632, 643 (1986); *accord Cariaga v. Local No. 1184 Laborers Int'l Union of N. Am.*, 154 F.3d 1072, 1075 (9th Cir. 1998), or whether the reference even specified the target document at all, *see Heitritter v. Callahan Constr. Co.*, No. 02-0889, 2003 WL 22015970, at *5 (Iowa Ct. App. Aug. 27, 2003).

Such is not the case here. Neither the parties nor the record suggests that the reference to Supplementary Conditions within the Project Manual fails to guide the reader to the allegedly incorporated document. Nordic, in fact, acknowledges "that the document at issue was provided to [it] in the project manual during bidding." Therefore, the identity of the Supplementary Conditions is not reasonably in question. Remaining to be resolved, however, is whether the parties assented to incorporation of those conditions, and it is here that the inquiry shifts from a matter of law to a matter of fact. *See Douglass*, 110 Hawaiʻi at 533, 135 P.3d at 142; *see also Lamb*, 47 F.3d at 558 ("Evidence of . . . assent may be found in the circumstances surrounding the agreement.").

We cannot determine from the Contract Documents alone whether the parties' signatures were a manifestation of their assent to incorporate the Supplementary Conditions. Despite the plainly incorporative purpose of Article 8, its incorporative mechanism is, in certain instances, ambiguous; in addition to

---

[12]    Nordic observes that the Project Manual is never actually defined as a specific document. It is, however, defined abstractly in Subparagraph 1.1.7 of the A201 Document, and it appears that Section 8.1.3 is intended to identify with specificity which particular document constitutes the Project Manual, but the "dated" field in Section 8.1.3 was left blank in the A101 Documents.

specifying portions of the Project Manual to be incorporated, the language "and are as follows" in Sections 8.1.3 and 8.1.4 implies that further specification of the provisions to be incorporated is expected. It is not clear from the Contract Documents whether the absence of such further specification is to be deemed fatal to the incorporation of the Supplementary Conditions. For this reason, we concur with the Circuit Court that it is ambiguous whether the parties assented to the incorporation of the Supplementary Conditions.

We therefore look to the surrounding circumstances of the case to ascertain whether the parties assented to incorporation of the Supplementary Conditions. *See Douglass*, 110 Hawaiʻi at 532, 135 P.3d at 141; *cf. Amfac, Inc. v. Waikiki Beachcomber Inv. Co.*, 74 Haw. 85, 124-25, 839 P.2d 10, 31 (1992) ("[P]arol evidence regarding the parties' intent as to the language used in a contract may be considered only when the contract language is ambiguous."). In doing so, we note that assent is a factual inquiry and that the parties offer disputed interpretations of several circumstances informing whether the parties intended to be bound to the Supplementary Conditions.

Safeway emphasizes the fact that Nordic was necessarily familiar with the Project Manual, including the Specifications therein, and the Supplementary Conditions, and that they had been an integral part of the bid process, suggesting that Nordic could not have bid or built the project without them. This may be a compelling argument, but contravening it, Safeway never attempts to explain why Section 8.1.3 remained as it was— seemingly incomplete—and ignores that portion of it which creates the ambiguity.

Nordic points out that Paragraph 4.6, like much of the rest of the A201 Document, had been modified by Safeway. Nordic argues that information as to why Safeway would modify a portion of the contract that it elsewhere deleted is germane to determining the parties' intent as to incorporation.

Additionally, on this record, Nordic's email to Safeway confirming its intent to sign the A101 Documents contingent upon "the understanding that the unit prices, list of drawings,

specifications, special clauses, exclusions, etc. . . . will be added into the contract documentation" is ambiguous and potentially highly relevant to the parties' understanding of the status of the Supplementary Conditions. Further evidence or testimony regarding this email could be instrumental to ascertaining the parties' intent as to incorporation of the Supplementary Conditions.

Thus, the question of whether the Project Manual and/or Supplementary Conditions was incorporated turns on disputed issues of fact; in particular, whether the parties assented to incorporation of the Supplemental Conditions in light of both their presence and relevance throughout the project, the oddly incomplete Section 8.1.3, and other circumstances discussed above that may reveal whether the parties did in fact have a "meeting of the minds," *see Earl M. Jorgensen Co.*, 56 Haw. at 470, 540 P.2d at 982, as to incorporation of the Supplementary Conditions. Indeed, the Circuit Court recognized that there were "genuine issues of material fact all over the place." We therefore cannot determine whether the Supplementary Conditions were incorporated as a matter of law.

B. As there were genuine issues of material fact pertaining to the existence of an agreement to arbitrate, the Circuit Court should have held an evidentiary hearing.

Notwithstanding the June 10, 2010 hearing, Nordic argues that it was deprived of an evidentiary hearing whereby the court, on a full record, should have resolved disputed issues of material fact prior to determining the existence and validity of the arbitration agreement. Safeway argues in response that an evidentiary hearing was not required and further argues that Nordic waived any claim for an evidentiary hearing by failing to request one prior to the Circuit Court's ruling.

HRS § 658A-7 requires that where a motion to compel arbitration is opposed, "the court shall proceed summarily to decide the issue[.]" HAW. REV. STAT. § 658A-7. HRS § 658A-7 is part of Hawai'i's enactment of the Revised Uniform Arbitration Act ("RUAA"), *see* 2001 Haw. Sess. Laws Act. 265, § 8 at 820, and

21

is practically identical to section 7 of the RUAA. *Compare* HAW. REV. STAT. § 658A-7, *with* RUAA § 7, 7 U.L.A. 31-32 (2009). The commentary to RUAA § 7 specifies that "[t]he term 'summarily' . . . has been defined to mean that a trial court should act expeditiously and without a jury trial to determine whether a valid arbitration agreement exists." RUAA § 7 cmt.

This court has previously noted, in an unpublished opinion, that an evidentiary hearing is an appropriate means to resolve issues of material fact where the disputed issues precluded granting a motion to compel arbitration as a matter of law. *See Tavares v. McNair*, No. 29590, 2010 WL 2535167, at *3 & n.2 (Haw. Ct. App. June 24, 2010). We now further consider that determination as well as whether such a hearing is not merely appropriate in the present case, but, rather, required.

While Hawaiʻi has not yet determined what a summary proceeding entails in this context, several of the many jurisdictions that have explicitly adopted the RUAA[13/] have explored or commented on that issue.

These jurisdictions generally construe the requirement to "proceed summarily" (or similar) as a procedure requiring two distinct determinations. First, a court should determine whether, on the basis of the parties' submissions, it can decide the issue (of the existence or enforceability of an arbitration agreement) as a matter of law. Second, if the court cannot do so because there are disputed issues of material fact, it should hold an evidentiary hearing to resolve those factual issues. *See Moffett v. Life Care Ctrs. of Am.*, 219 P.3d 1068, 1079 (Colo. 2009) (en banc) ("The court must determine whether material issues of fact are disputed and, if such factual disputes exist, it must conduct an expedited evidentiary hearing to resolve the dispute." (quoting *J.A. Walker Co. v. Cambria Corp.*, 159 P.3d 126, 130 (Colo. 2007))); *St. Fleur v. WPI Cable Systems/Mutron*, 879 N.E.2d 27, 33 (Mass. 2008) ("[T]hose courts [which have interpreted the phrase 'proceed summarily' under the Uniform

---

[13/] The preface to the RUAA indicates that thirty-five states have adopted the RUAA and fourteen others have adopted "substantially similar legislation." Prefatory Note to the RUAA.

Arbitration Act] have interpreted [it] to mean that a judge determines whether there is a dispute as to a material fact; and, if there is *not* such a dispute, the judge resolves the issue as a matter of law; but, if there *is* such a dispute, the judge conducts an expedited evidentiary hearing on the matter and then decides the issue."); *Nitro Distributing, Inc. v. Dunn*, 194 S.W.3d 339, 352 (Mo. 2006) (en banc) ("Where . . . there [are] disputed factual issues, it is necessary to conduct an evidentiary hearing."); *Jack B. Anglin Co. v. Tipps*, 842 S.W.2d 266, 269 (Tex. 1992) ("[W]e hold that the trial court may summarily decide whether to compel arbitration on the basis of affidavits, pleadings, discovery, and stipulations. However, if the material facts necessary to determine the issue are controverted, by an opposing affidavit or otherwise admissible evidence, the trial court must conduct an evidentiary hearing to determine the disputed material facts."); *accord Haynes v. Kuder*, 591 A.2d 1286, 1290 (D.C. Ct. App. 1991); *FL-Carrollwood Care Ctr., LLC v. Estate of Gordon ex rel. Gordon*, 34 So. 3d 804, 806 (Fla. Dist. Ct. App. 2010); *Bass v. SMG, Inc.*, 765 N.E.2d 1079 (Ill. App. Ct. 2002).

These authorities demonstrate that the summary nature of the proceeding should not deprive the parties of the opportunity to present evidence at a hearing in order to resolve genuine issues of material fact.[14/] Indeed, in other types of cases that are treated akin to motions for summary judgment, such issues are resolved by "trial or an evidentiary hearing." *See, e.g., Gilmartin v. Abastillas*, 10 Haw. App. 283, 296, 869 P.2d 1346, 1352 (1994) ("A motion to enforce a disputed settlement agreement is treated as a motion for summary judgment. A motion for summary judgment should not be granted where there is a factual question as to the existence, validity, and terms of the alleged settlement agreement, and where such a dispute exists, *a trial or an evidentiary hearing to resolve the dispute is required*." (emphasis added and citations omitted)).

---

[14/]    In neither *Brown* nor *Douglass* does it appear that the parties argued that they were entitled to such a hearing. Thus, the Hawaiʻi Supreme Court did not have occasion to review on that basis.

The purpose of an evidentiary hearing in the context of a motion to compel arbitration is to permit parties to present evidence beyond the "affidavits, pleadings, discovery, and stipulations submitted by the parties." *Moffett*, 219 P.3d at 1079; *see also Keeton v. Wells Fargo Corp.*, 987 A.2d 1118, 1122 (D.C. Ct. App. 2010) ("On remand, the trial court should allow discovery, followed by an evidentiary hearing to determine the unconscionability of the arbitration clause."). *But see Nitro Distributing, Inc.*, 194 S.W.3d at 352 (holding no error where the trial court declined to hear live witness testimony where it had reviewed a "voluminous mass" of over "3700 pages of documents, affidavits, deposition transcripts and other materials," and reasoned that "the evidence . . . was more than ample to resolve [the parties'] disputes"). In other words, parties should generally have the opportunity to present additional evidence where doing so would further resolution of factual disputes. Providing the parties with an opportunity to demonstrate the existence of an arbitration agreement also promotes our strong policy favoring arbitration agreements where they may be found to exist. *See Douglass*, 110 Hawai'i at 531, 135 P.3d at 140.

We therefore hold that, upon a disputed motion to compel arbitration, where there are genuine issues of material fact as to the existence of an arbitration agreement, a trial court must resolve those issues through an evidentiary hearing. We do not propose here to prescribe the scope or conduct of the evidentiary hearing except to conclude that what was provided in this case was insufficient. At a minimum, where live witness testimony or cross examination of affiants would meaningfully promote resolution of factual disputes, such evidence should be received.

C.   To the extent that the Circuit Court may have intended its hearing on Nordic's Motion to Compel as an evidentiary hearing, it was not, and Nordic is entitled to a proper evidentiary hearing.

Despite its suggestion at the hearing on Nordic's Motion for Reconsideration that its prior hearing had constituted an evidentiary hearing, the Circuit Court did not consider that

one whose summary judgment motion is denied goes on to receive a trial or evidentiary hearing. *See* Haw. R. Civ. P. 56(d). Thus, the court's procedure and hearing fell short of the mark. It is not apparent from the Circuit Court's initial order whether it regarded the question of incorporation as a matter of law, fact, or both. It stated, in relevant part, that "The [Contract] incorporates . . . Section 8.1.3, Supplementary and other Conditions of Contract contained in the Project Manual[.]" It cited the fact that two other sections of the Contract Documents, in the context of specifying the Specifications, contemplate the Project Manual. But it did not otherwise provide any discussion, findings, or conclusions regarding its efforts to discern what constituted the contract was, despite finding that the contract itself was confusing. The court, in fact, acknowledged at the hearing on Nordic's Motion for Reconsideration that there were genuine issues of material fact throughout the case.

Nordic was thus entitled to an evidentiary hearing. Contrary to the Circuit Court's characterization of its hearing on the Motion to Compel as an evidentiary hearing, it merely heard argument regarding previously-submitted evidence. While it may not be necessary to hear live testimony in all cases, *see, e.g., Nitro Distributing, Inc.*, 194 S.W.3d at 352, disputed factual issues cannot be resolved on the basis of an under-developed record, *see Keeton*, 987 A.2d at 1122; *FL-Carrollwood Care Ctr.*, 34 So. 3d at 806 (requiring "a full evidentiary hearing" where "the court implicitly determined that a substantial issue concerning the making of the agreement was raised").

Safeway argues that Nordic waived any right to an evidentiary hearing by not requesting one until after the Circuit Court issued its ruling. However, as discussed above and as Nordic maintains on appeal, the Circuit Court's initial inquiry should have focused on, and resolved, whether it could grant the Motion to Compel as a matter of law; this it did not do, and Nordic was deprived of the proper opportunity to request such a hearing. Indeed, in the context of summary judgment proceedings, where the court makes a preliminary examination of the evidence,

parties do not waive the right thereafter to present testimony and have their cases heard. *See* Haw. R. Civ. P. 56(d). Nordic remains entitled to an evidentiary hearing.

V.   CONCLUSION

We therefore vacate the July 1, 2010 Order Denying Petitioner Nordic PCL Construction, Inc.'s Application to Compel Arbitration, and the September 23, 2010 Order Denying Nordic PCL Construction, Inc.'s Motion to Clarify, Amend, or Reconsider Order Denying Petitioner Nordic PCL Construction Inc.'s Application to Compel Arbitration. We remand the case to the Circuit Court for further proceedings consistent with this opinion.

On the briefs:

David Schulmeister and
Jeffrey M. Osterkamp
(Cades Schutte LLP)

and

Wayne M. Sakai,
Michiro Iwanaga, and
Daniel M. Chen
(Sakai Iwanaga Sutton Law Group)
for Defendant-Appellant
Nordic PCL Construction, Inc.


Terence J. O'Toole,
Judith Ann Pavey, and
Wil K. Yamamoto
(Starn O'Toole Marcus & Fisher)
for Plaintiff-Appellee
Safeway, Inc.
for Defendant-Appellant


Lorraine H. Akiba,
Paul B.K. Wong, and
Jordon J. Kimura
(McCorriston Miller Mukai MacKinnon)
for Defendants/Appellees
Division Seven Consulting of
Hawaii, Inc. and Grant Henry